Charisse Arce
Maile Tavepholjalern
EARTHJUSTICE
310 K Street, Suite 508
Anchorage, AK 99501
T: 907.277.2500
E: carce@earthjustice.org
E: mtave@earthjustice.org

Katharine S. Glover
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: kglover@earthjustice.org
E: ejorgensen@earthjustice.org

Andrea A. Treece (*pro hac vice forthcoming*)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
T: 415.217.2089
E: atreece@earthjustice.org

*Attorneys for Plaintiff Oceana, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| OCEANA, INC. | ) |
|     *Plaintiff,* | ) |
| | ) |
|     v. | ) Case No. 3:24-cv-00180-__ |
| | ) |
| NATIONAL MARINE FISHERIES SERVICE; UNITED | ) |
| STATES DEPARTMENT OF COMMERCE; GINA M. | ) |
| RAIMONDO, in their official capacity as Secretary of | ) |
| Commerce; and SAMUEL D. RAUCH, III, in their | ) |
| official capacity as Deputy Assistant Administrator for | ) |
| Regulatory Programs, National Marine Fisheries Service, | ) |
| | ) |
|     *Defendants.* | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
## (5 U.S.C. §§ 702, 706; 16 U.S.C. §§ 1851(A)(2), 1853-55; 42 U.S.C. § 4332)

## INTRODUCTION

1. This action challenges the Defendants' approval of amendments to five fishery management plans ("FMP") for fisheries in the North Pacific. The amendments revise the plans' descriptions of essential fish habitat ("EFH"), which includes all types of aquatic habitat where fish breed, spawn, feed, or grow to maturity. The amendments also update the analyses of adverse effects of fishing and other activities on EFH. In approving these amendments, Defendants ignored important obligations under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), and National Environmental Policy Act ("NEPA"). Instead of using the amendments to advance protection of corals, sponges, and seafloor habitat from the destructive effects of trawling, Defendants ignored and underrepresented fishing effects and declined to consider alternatives that would have protected benthic species and habitat with minimal displacement of fishing effort.

2. Plaintiff asks this Court to declare that Defendants' decision to approve the amendments violates the MSA, NEPA, and the Administrative Procedure Act ("APA") and set the amendments aside.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1346, 1361, and 1362, and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02. Judicial review, vacatur, and injunctive relief are available under the APA, 5 U.S.C. §§ 701-04, 706.

4.     Venue is appropriate under 28 U.S.C. § 1391(e) because a substantial part of the events and omissions giving rise to this action occurred in this District.

## PLAINTIFF

5.     Plaintiff Oceana, Inc. ("Oceana") is a non-profit international advocacy organization dedicated to protecting and restoring the world's oceans through policy, advocacy, science, law, and public education.  Oceana has over 1,505,097 members worldwide, including 5,225 members in Alaska.  Oceana maintains offices in Juneau, Alaska.  Ensuring the conservation and sound management of seafloor habitat, including EFH, is a central focus of Oceana's work.

6.     Oceana devotes considerable resources to studying and communicating the ecological and economic importance of sound management of fisheries in the North Pacific.  Oceana monitors agency compliance with laws respecting the North Pacific Ocean ecosystem and educates its supporters, members, and the public concerning management of the ecosystem.  It also advocates for policies and practices that conserve the natural values of the North Pacific ecosystem.  Oceana cannot fully achieve these organizational purposes without adequate information and public participation in the processes required by law.  Oceana's interests and organizational purposes are directly and irreparably injured by Defendants' violations of the laws as described in this complaint.

7.     Oceana participates actively in the administrative processes established for

management of the North Pacific and did so for the processes related to the amendments challenged in this litigation.  Oceana submitted comments to the North Pacific Fishery Management Council ("Council") at each stage of the EFH five-year review and EFH amendment process.  Oceana also submitted comments to the National Marine Fisheries Service ("Service") regarding the EFH amendments.  Oceana has exhausted administrative remedies for the decision challenged in this complaint.

8.     Oceana's members live near and use areas affected by the EFH amendments decision and rely on the marine resources of the Gulf of Alaska, Bering Sea, and Aleutian Islands for research, recreation, wildlife viewing, supporting their livelihoods, and other purposes.  They derive scientific, recreational, aesthetic, conservation, and other benefits from their use and enjoyment of the ecosystems affected by the Service's decision.  The EFH amendments will directly and irreparably injure these interests.

## DEFENDANTS

9.     Defendant Service is a federal agency within the United States Department of Commerce responsible for the management, conservation, and protection of living marine resources within 200 miles of the United States coast.  On July 19, 2024, the Service gave notice of its approval of five FMP amendments:  amendment 127 to the FMP for Groundfish of the Bering Sea and Aleutian Islands Management Area, amendment 115 to the FMP for Groundfish of the Gulf of Alaska, amendment 56 to the FMP for Bering Sea and Aleutian Islands King and Tanner Crabs, amendment 17 to the

FMP for the Salmon Fisheries in the exclusive economic zone off Alaska, and amendment 3 to the FMP for Fish Resources of the Arctic Management Area (collectively, "EFH amendments").

10.   Defendant United States Department of Commerce is an agency of the United States responsible for oversight of the Service.

11.   Defendant Gina M. Raimondo is sued in their official capacity as Secretary of Commerce.  The Secretary holds the highest position within the United States Department of Commerce and has ultimate responsibility for overseeing the Department and its agencies and ensuring their compliance with all applicable federal laws.  The Secretary also has specific responsibilities related to the administration of the groundfish fisheries of Alaska.

12.   Defendant Samuel D. Rauch, III, is sued in their official capacity as Deputy Assistant Administrator for Regulatory Programs for the Service.  Defendant Rauch oversees the Service's regulatory actions and programs, including those to support the conservation and recovery of marine mammals and endangered species, ensure economically and biologically sustainable fisheries, and promote habitat stewardship through restoration and conservation.  Defendant Rauch signed the EFH amendments.

## STATEMENT OF FACTS

## I.    Fishing and the North Pacific Ocean ecosystem

13.   The North Pacific ecosystem is among the most productive on Earth.  It supports a variety of fish, crustaceans, marine mammals, seabirds, corals, sponges, and

other organisms.

14.     This marine ecosystem is also stressed by the combined effects of industrial fishing and a rapidly changing climate.  Multiple fish and crab stocks have crashed and sea ice has all but disappeared in recent years.

15.     Although the North Pacific provides essential habitat for many species, industrial trawl fishing is authorized in much of this habitat, resulting in significant damage to the habitat that sustains these species.

16.     Fishing can affect habitat in many ways, including changing the abundance or availability of habitat features needed for fish and other marine species to spawn, breed, feed, grow, and shelter from predators.

17.     Trawl fishing can be particularly damaging to benthic, or seafloor, habitat. Trawling is a non-selective fishing technique in which large boats drag nets on or near the ocean floor, scooping up everything they encounter, including corals and sponges, crabs, and prohibited species or bycatch.

18.     Although pelagic, or mid-water, trawls are not considered bottom trawls, new information shows that pelagic trawls are in contact with the seafloor between 40 and 100 percent of the time.

19.     Trawling disturbs spawning and nursery habitat for crabs and reduces benthic habitat productivity for forage fish important to species ranging from seabirds to marine mammals.

20.     Trawl fishing can kill or damage corals, sponges, and other benthic

organisms. If not destroyed by trawling, some corals and sponges can live for hundreds or thousands of years. They provide complex habitat for fish and other species, including commercially important species like rockfish, crab, and prawns.

21. Damage to long-lived, slow-growing, and sedentary species, like cold-water corals and sponges, can be irreversible.

22. There are known Pacific halibut spawning and nursery grounds in the Gulf of Alaska, the Bering Sea and Aleutian Islands, and other areas of the North Pacific. Pacific halibut populations are in decline, with reduced size at age and poor recruitment documented in these populations.

23. Nonetheless, groundfish trawling occurs in much of the known Pacific halibut spawning and nursery habitat.

24. There is also substantial overlap between trawling and habitat for Gulf of Alaska king and Tanner crabs.

25. Alaska Native peoples have relied on marine resources from the Gulf of Alaska, Bering Sea and Aleutian Islands, and the Arctic Ocean for thousands of years and these marine resources remain central to their lives and cultures. Some villages have been occupied for over 7,000 years, a testament to the sustaining ocean resources of the North Pacific.

26. Gulf of Alaska fish populations are also an economic engine for commerce and jobs. The region's commercial fisheries provide direct employment for 14,500 people, equivalent to 6,000 full time jobs for captains and crew in the region. Thousands

more jobs are supported by recreational fishing, seafood processing, fisheries management and monitoring, boat and equipment maintenance and repair, and the secondary effects from fishing income spent in communities.

27.     Protecting, conserving, and enhancing EFH is important to protecting healthy populations of fish, crab, and other marine species.

28.     Protecting, conserving, and enhancing EFH requires limiting trawling in important or sensitive habitat.

29.     Protecting, conserving, and enhancing EFH is especially important in light of recent environmental changes in the North Pacific.  Habitat protections can help to support more climate-resilient populations of fish, crab, and other marine species.

30.     In the last two decades, there have been significant changes in the North Pacific ecosystem, including loss of sea ice, changes in food web dynamics, and shifts in the abundance and distribution of various species.

31.     Climate change exacerbates other anthropogenic impacts to EFH. Warming ocean temperatures and reduced sea ice in areas of EFH are linked to altered trophic dynamics and shifts in the abundance and distribution of species.

32.     Declining sea ice extent in the Arctic is related to decreasing productivity in the Bering Sea.  Over the last two decades, the climate regime in the Bering Sea has shifted from one of high inter-annual variability, with a series of warm and cold years alternating, to a multiyear pattern consisting of two prolonged warm periods with a cold period (2006-2013) in between.  The second warm period was the unprecedented marine

heat wave from 2014-2019.

33.    The Gulf of Alaska experienced this heat wave as well, with corresponding declines in zooplankton, low biomass of pollock and Pacific cod, reproductive failures for seabirds, and declines in structural epifauna, particularly sponges.

34.    Based on projected increases in frequency and duration of marine heatwaves, researchers are uncertain when or if the Gulf of Alaska ecosystem will return to pre-Pacific marine heatwave conditions.

35.    The Gulf of Alaska is especially vulnerable to ocean acidification as a result of climate change and natural influences.

36.    Increases in ocean temperature and associated changes in ocean chemistry are expected to alter habitat suitability and important attributes of EFH, including ocean chemistry, nutrient and prey availability, salinity, water quality, and water quantity.

37.    For example, recent declines in Gulf of Alaska Pacific cod (*Gadus microcephalus*) and walleye pollock (*Gadus chalcogrammus*) are linked with alterations in habitat leading to changed trophic dynamics, reduced survival of larval and young-of-year life history stages, and reduced recruitment and adult abundance.

38.    In the last several years, multiple species of crab stocks have collapsed. The three main crab stocks in the Bering Sea are at historically low levels of abundance. The red king crab (*Paralithodes camtschaticus*) directed fishery was closed for the second season in a row in 2022-2023 due to low levels of female abundance. Snow crab (*Chionoecetes opilio*) was closed for the first time in the history of this domestic fishery

in 2022-2023, and was closed again in 2023-2024, due to extremely low levels of abundance.  While the Tanner crab (*Chinoecetes bairdi*) directed fishery was open during the 2022-2023 and 2023-2024 seasons, levels of abundance remain low.  All three of these iconic Alaska crab fisheries have experienced fishery disaster(s) in recent years.

39.     In the Aleutian Islands, the Service has previously implemented measures to limit bottom trawling to areas where trawling has historically occurred and to protect important coral and sponge gardens.

40.     The Service has not implemented similar measures in the Gulf of Alaska.

41.     The Gulf of Alaska is the last place on the Alaska coast where the Service has not limited the footprint of bottom trawling to protect seafloor habitat.

## II.     Federal fisheries management and the EFH five-year review

42.     The MSA governs the conservation and management of fisheries in U.S. territorial waters and in the exclusive economic zone, which extends from the boundaries of state waters (typically three miles from shore) to 200 miles offshore or to an international boundary with neighboring countries.  16 U.S.C. §§ 1801(b)(1), 1802(11). The MSA creates eight regional fishery management councils and requires them to prepare FMPs for all fisheries under their authority that require conservation and management.  *Id.* § 1852(a), (h)(1).

43.     The North Pacific Fishery Management Council is the regional council for federal fisheries off Alaska.

44.     While the MSA assigns various advisory tasks to the Council, the Service is

ultimately responsible for carrying out the law.  The MSA requires the Service to ensure that all FMP amendments comply with the MSA and all other applicable law.  16 U.S.C. § 1854(a).

45.     The MSA sets forth certain measures that each FMP must contain, including conservation and management measures that are necessary and appropriate to prevent overfishing, rebuild overfished fish populations, and promote the long-term health of the fishery, 16 U.S.C. § 1853(a)(1)(A), and measures that identify, conserve, and enhance essential fish habitat, *id.* § 1853(a)(7).

46.     The MSA requires that FMPs, FMP amendments, and any regulations promulgated to implement such FMPs, be consistent with the "national standards" for fishery conservation and management.  16 U.S.C. § 1851(a).

47.     National standard two of the MSA requires that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2).  "Conservation and management measures" include "all of the rules, regulations, conditions, methods, and other measures" to "rebuild, restore, or maintain . . .  the marine environment" and "assure that . . . irreversible or long-term effects on fishery resources and the marine environment are avoided."  *Id.* § 1802(5).

48.     When Congress enacted the EFH requirements in 1996, it recognized that habitat loss poses "[o]ne of the greatest long-term threats to the viability of commercial and recreational fisheries," apart from overfishing, and continued viability of the Nation's fisheries depended on establishing a new program "to facilitate long-term protection of

essential fish habitats."  16 U.S.C. § 1801(a)(6), (9).

49.    The MSA defines "essential fish habitat" as "those waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity."  16 U.S.C. § 1802(10).

50.    The MSA requires all FMPs to (1) "describe and identify essential fish habitat for the fishery" based on Service guidelines; (2) "minimize to the extent practicable adverse effects on such habitat caused by fishing;" and (3) "identify other actions to encourage the conservation and enhancement of such habitat."  16 U.S.C. § 1853(a)(7).

51.    The MSA expressly requires the Service to assist the Council in regularly updating its identification of EFH and adverse impacts to EFH based on new information, as well as actions that could be taken to ensure the conservation and enhancement of EFH.  The aim of this exercise extends well beyond simply mapping EFH.  Ultimately, the Council and the Service must use this information to identify potential actions to "ensure the conservation and enhancement" of EFH.  16 U.S.C. §§ 1851(a)(2), 1855(b)(1)(A)-(B).

52.    Consistent with the statute's language and direction, the Service's guidelines require that EFH designations, including assessments of adverse impacts to EFH from fishing activities and measures to minimize those impacts and enhance EFH, be updated at least every five years.  50 C.F.R. § 600.815(a)(10).

53.    Separately, the MSA recognizes that excessive fishing pressure is another,

distinct threat to the sustainability of fisheries and thus requires the Service to prevent overfishing. 16 U.S.C. §§ 1801(b)(2), 1851(a)(1). The MSA defines the terms "overfishing" and "overfished" to mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." *Id.* § 1802(34).

54.     To aid that effort, the MSA requires each FMP to include measures to prevent or end overfishing and rebuild overfished populations, and to establish objective and measurable criteria to identify when a fish population is or is about to become overfished. 16 U.S.C. § 1853(a)(1), (10). Those criteria include the "minimum stock size threshold," which the agency defines as "the level of biomass below which the capacity of the stock or stock complex to produce [maximum sustainable yield] on a continuing basis has been jeopardized." 50 C.F.R. § 600.310(e)(2)(i)(F).

55.     In other words, the minimum stock size threshold is used to identify when a fish population is overfished.

## III.     The EFH amendments and NEPA review

56.     Every FMP contains components related to EFH. These components describe and identify EFH and fishing and other activities that adversely affect EFH, provide conservation and enhancement recommendations, list prey species, identify habitat areas of particular concern, and identify research needs.

57.     In 2019, the Council began a five-year review of EFH components, or management measures, in five FMPs in the exclusive economic zone off Alaska.

*Oceana, Inc. v. National Marine Fisheries Service et al.,*
Case No. 3:24-cv-00180-__                                                          13

58.     The Service approved the EFH amendments to the five FMPs on July 19, 2024.

59.     The EFH amendments update descriptions and identification of EFH and information about the adverse effects of fishing and non-fishing activities on EFH.

60.     The Service did not prepare an environmental impact statement to analyze the effects of the EFH amendments.

61.     Instead, in conjunction with the EFH amendments, the Service prepared an environmental assessment.

62.     The environmental assessment considered only two alternatives: a no action alternative that would not amend any FMPs and a preferred action alternative that would amend the five FMPs to revise EFH descriptions, maps, or other information.

63.     The environmental assessment incorporates by reference the Service's 2005 Final Environmental Impact Statement for Essential Fish Habitat Identification and Conservation in Alaska ("2005 EFH EIS").

64.     As part of its five-year review, the Service also conducted an evaluation of fishing effects on EFH. The fishing effects model it used for this evaluation is similar to the model it used in the previous five-year EFH review that ended in 2017.

65.     At the conclusion of the previous five-year review in 2017, the Council's science and statistical committee recommended that the fishing effects model be reviewed by the Center for Independent Experts. It made the same recommendation in February 2023.

*Oceana, Inc. v. National Marine Fisheries Service et al.,*
Case No. 3:24-cv-00180-___                                                          14

66.     The Center for Independent Experts review has not occurred.

67.     The fishing effects model assumed that long-lived habitat features with recovery times of 10-50 years only occur in deep and rocky sediments below 300 meters. It also averaged recovery times across all habitat features in a given sediment type.

68.     Further, in the fishing effects evaluation, the Service only evaluated the effects of fishing on adult life stages.  To determine whether there were adverse impacts to EFH, the Service used fish biomass levels as a proxy and evaluated disturbance to habitat only in what it considered "core" EFH areas.

69.     Using the fishing effects model, the Service determined the adverse impacts of fishing to core EFH areas were not more than minimal and temporary and therefore did not require minimization.

70.     The EFH five-year review did not address impacts on habitats essential to Gulf of Alaska crab, Pacific halibut, lingcod, salmon, Pacific herring, or forage fish. These species and their habitats are vitally important for subsistence, commercial, sport, and personal-use fisheries in Alaska.  These species are also taken in substantial quantities as bycatch in the federal groundfish fisheries which operate in their essential habitats.

**CLAIMS FOR RELIEF**

**Count I**

**(Violation of the MSA:  The Service failed to define adverse fishing effects on EFH consistent with MSA requirements)**

71.     Plaintiff incorporates by reference each of the allegations in the preceding paragraphs.

72.     The MSA requires the Service to evaluate fishing effects on EFH and minimize adverse effects.  16 U.S.C. § 1853(a)(7).  The statute does not define "adverse effects."

73.     In its EFH guidelines, the Service defines adverse effects to be those that are more than minimal or temporary in nature, but the guidelines do not provide any criteria for defining what "minimal" or "temporary" means.  *See* 50 C.F.R. § 600.815(a)(2)(ii).  The Service's regulatory definition creates a broad exception to the effects it must consider "adverse" that does not exist in the MSA.

74.     The Service claimed to evaluate whether fishing causes adverse effects on EFH using two main methods: (1) assuming that effects were "more than minimal" if the fish stocks for which the EFH was designated had dropped below their minimum stock size threshold (*i.e.*, were overfished); and (2) if estimated habitat disturbance from fishing in the "core" EFH area used by fish in the summer equaled or exceeded ten percent.

75.     The Service's use of the minimum stock size threshold as a proxy for defining adverse habitat effects unlawfully and arbitrarily conflates the agency's duty to

prevent overfishing, 16 U.S.C. §§ 1851(a)(1), 1853(a)(10), with its separate and distinct duty to ensure the conservation and enhancement of EFH, *id.* §§ 1853(a)(7), 1855(b).

76.     The Service's approach is also illogical and lacks any rational basis in evidence or the best available science.  16 U.S.C. § 1851(a)(2).  The agency failed to demonstrate that stock declines reliably reflect adverse effects on EFH.  Even if it could, assuming that habitat effects are only "adverse" after they have become so severe that they cause a fish population to collapse is plainly contrary to the purpose of the EFH provisions and the Service's duty to *conserve* and *enhance* EFH.

77.     The Service's decision to only consider habitat disturbance to "core" EFH areas in determining whether fishing effects are adverse or, in the agency's view, more than minimal, also violates the MSA.  The statute requires the Service to identify adverse impacts to areas the agency has designated as *essential* fish habitat.  By definition, all designated EFH is "essential" or "necessary" to support spawning, breeding, feeding, or growth to maturity.  16 U.S.C. § 1802(10).  By considering only a subset of that area, the Service failed to evaluate and identify adverse impacts on EFH.

78.     In addition, the Service's failure to consider impacts to EFH for all life stages of fish is contrary to the MSA's definition of EFH, which specifies that EFH must be identified for all life stages—spawning, breeding, feeding, and growth to maturity.  16 U.S.C. § 1802(10); *see also* 50 C.F.R. § 600.10.  It also conflicts with the agency's own guidance and the best available science, which recognize that fish at different life stages use different types and areas of habitat.  By failing to consider all of these

components of EFH, the Service failed to adequately evaluate and identify adverse fishing impacts to designated EFH.

79.     The Service's actions and failures to act are arbitrary and capricious, violate the MSA and the APA, and are causing irreparable injury to the Plaintiff for which it has no adequate remedy at law.  16 U.S.C. §§ 1851(a)(2), 1853(a)(7), 1855(b)(1)(B); 5 U.S.C. § 706(1), (2)(A), (D).

### Count II

**(Violation of the APA and the MSA:  The Service's decision to approve the EFH amendments was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the MSA)**

80.     Plaintiff incorporates by reference each of the allegations in the preceding paragraphs.

81.     The MSA sets forth three basic obligations the Service must meet with respect to EFH.  First, the agency must describe and identify EFH for fish stocks it manages.  Second, it must minimize adverse effects on EFH caused by fishing.  Third, it must identify other actions to promote the conservation and enhancement of EFH. 16 U.S.C. §§ 1853(a)(7), 1855(b)(1).

82.     The MSA requires the Service to accomplish these duties on an ongoing basis.  The statute establishes an iterative process whereby, at least every five years, the agency must assist the Council in updating EFH descriptions, identifying adverse effects on EFH, and identifying and recommending actions to minimize adverse fishing effects as well as to ensure the conservation and enhancement of EFH.  16 U.S.C. §§ 1853(a)(7),

1855(b)(1)(A)-(B); 50 C.F.R. §§ 600.815(a)(2), (6), (10), 600.815(b).

83.     The Service may only approve an FMP or FMP amendment that fully complies with the MSA and all other applicable law.  16 U.S.C. § 1854(a).

84.     The Service's approval of the EFH amendments was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the MSA because the agency failed to consider important aspects of EFH, failed to draw a rational connection between the evidence before it and the decision it made, failed to base its decision on the best scientific information available, and failed to carry out non-discretionary duties under the MSA.

85.     For example, the Service failed to analyze and disclose the adverse impacts of fishing on long-lived deep-sea corals and sponges, particularly those at depths shallower than 300 meters.  These habitat-forming animals are a component of EFH and highly vulnerable to serious, long-lasting damage from trawl fishing.

86.     Despite evidence that trawl fishing has caused adverse effects on EFH, the Service failed to identify or recommend any measures to minimize those effects.

87.     The Service failed to identify or recommend measures to conserve and enhance EFH, despite information presented to it regarding potential measures available to prevent further known impacts from trawl fishing and to promote habitat recovery. 16 U.S.C. §§ 1853(a)(7), 1855(b)(1)(A)-(B); 50 C.F.R. §§ 600.815(a)(2), (6), (10), 600.815(b).

88.     The Service's actions and failures to act are arbitrary and capricious, violate

the MSA and the APA, and are causing irreparable injury to the Plaintiff for which it has no adequate remedy at law.  16 U.S.C. §§ 1853(a)(7), 1855(b)(1)(A)-(B); 5 U.S.C. § 706(1), (2)(A), (D).

## Count III

### (Violation of NEPA and the APA:  Failure to analyze environmental impacts of EFH amendments in an environmental impact statement)

89.    Plaintiff incorporates by reference each of the allegations in the preceding paragraphs.

90.    NEPA requires federal agencies to prepare environmental impact statements for "major Federal actions significantly affecting the quality of the human environment . . . ."  42 U.S.C. § 4332(2)(C).

91.    The decision adopting the EFH amendments is a major federal action.

92.    The Service did not prepare an environmental impact statement to analyze the effects of the decision in light of the current environmental context.  Instead, it prepared an environmental assessment, incorporating by reference its 2005 EFH EIS.

93.    The 2005 EFH EIS does not encompass the five-year review and EFH amendments.

94.    Although, under NEPA, agencies may "tier" their analysis in a site-specific or project-level environmental impact statement or environmental assessment to a broad environmental impact statement, 40 C.F.R. § 1501.11 (2020); 40 C.F.R. § 1501.11(b) (2024), tiering is not appropriate here.

95.     Moreover, even where tiering is appropriate, an agency may not rely on an outdated environmental impact statement.

96.     An agency must prepare a supplemental environmental impact statement whenever there is significant new information relevant to the action or its effects on the environment.

97.     The 2005 EFH EIS is severely outdated.  There have been significant changes in the North Pacific ecosystem since 2005 bearing on the decision to adopt the EFH amendments.

98.     The Service's failure to complete an environmental impact statement for the EFH amendments decision or to supplement the 2005 EFH EIS despite these significant changes is arbitrary, capricious, and not in accordance with NEPA and the APA.  5 U.S.C. § 706(1), (2)(A), (D); 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.9(d)(1)(ii).

**Count IV**

**(Violation of NEPA and the APA:  Failure to discuss potentially significant environmental impacts and consider alternatives)**

99.     Plaintiff incorporates by reference each of the allegations in the preceding paragraphs.

100.    When an action is not categorically excluded from NEPA, an agency may prepare an environmental assessment to assist in determining whether the action has potentially significant impacts requiring the preparation of an environmental impact

statement. 40 C.F.R. § 1501.5 (2024); 40 C.F.R. § 1501.5 (2020). If, after an agency completes an environmental assessment, it concludes that the effects of the proposed action are potentially significant, it must complete an environmental impact statement. If it concludes the proposed action will not have significant impacts, the agency must prepare a finding of no significant impact. 40 C.F.R. § 1501.6(a)(1) (2024); 40 C.F.R. § 1501.6 (2020).

101.    In an environmental assessment, an agency must discuss the effects of the proposed action and alternatives. 40 C.F.R. § 1501.5(c) (2024); 40 C.F.R. § 1501.5(c)(2) (2020). In the environmental assessment it prepared for the EFH amendments, the Service considered only two alternatives: a no action alternative and the preferred alternative (proposed action). It declined to consider other alternatives, including alternatives that would better meet the Service's statutory obligations to conserve and enhance EFH.

102.    The environmental assessment also failed to consider or understated the effects of the action on EFH for juvenile and sub-adult life stages of fish species; habitat important to Gulf of Alaska crab, Pacific halibut, lingcod, salmon, Pacific herring, or forage fish; and long-lived species such as corals, sponges, and sea whips.

103.    The environmental assessment was inadequate under NEPA because it failed to consider a reasonable range of alternatives and take a hard look at the effects of the action on important resources. The Service's reliance on this inadequate environmental assessment is arbitrary and violates NEPA and the APA. 42 U.S.C. §

4332(2)(C); 40 C.F.R. § 1501.5 (2024); *id.* § 1501.6 (2024); 40 C.F.R § 1501.5 (2020); *id.* § 1501.6 (2020); 5 U.S.C. § 706(1), (2)(A), (D).

104.    In addition, the Service acted arbitrarily by concluding, in reliance on an inadequate environmental assessment, that an environmental impact statement was not required for the EFH amendments.  5 U.S.C. § 706(1), (2)(A), (D); 42 U.S.C. § 4332(2)(C).

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court:

1.    Enter a declaratory judgment that:

a.    The Service's decision to approve the EFH amendments was arbitrary, capricious, and not in accordance with the MSA, NEPA, and the APA; and

b.    Defendants' reliance on the 2005 EFH EIS is arbitrary, capricious, and not in accordance with NEPA.

2.    Vacate the decision adopting the EFH amendments and the environmental assessment supporting the EFH amendments.

3.    Remand the EFH amendments and the environmental assessment supporting the EFH amendments for completion of new EFH amendments that comply with the MSA and the APA, and for completion of new NEPA analysis of the EFH amendments that complies with NEPA and the APA, within no more than one year from the date of the entry of judgment.

4.    Enter injunctive relief as needed.

5.      Award Plaintiff its costs, fees, and other expenses of this action, including

reasonable attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

6.      Grant such other relief as this Court deems just and proper.

 Respectfully submitted this 16th day of August, 2024.

*s/ Charisse Arce*
Charisse M. Arce (Alaska Bar No. 2303017)
EARTHJUSTICE
310 K Street, Suite 508
Anchorage, AK 99501
T: 907.277.2500
E: carce@earthjustice.org


*s/ Maile Tavepholjalern*
Maile Tavepholjalern (Alaska Bar No. 1611094)
EARTHJUSTICE
310 K Street, Suite 508
Anchorage, AK 99501
T: 907.277.2500
E: mtave@earthjustice.org

*s/ Katharine S. Glover*
Katharine S. Glover (Alaska Bar No. 0606033)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: kglover@earthjustice.org

*s/ Eric Jorgensen*
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

_s/ Andrea A. Treece_
Andrea A. Treece (California Bar No. 237639)
(_pro hac vice forthcoming_)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
T: 415.217.2089
E: atreece@earthjustice.org

_Attorneys for Plaintiff Oceana, Inc._