James C. Feldman (AK Bar No. 1702003)
Eva Sharf Oliver (*Pro Hac Vice*)
SUMMIT LAW GROUP, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, WA 98104
Phone: (206) 676-7000
*jamesf@summitlaw.com*
*evao@summitlaw.com*

***Attorneys for At-Sea Processors Association,
Alaska Groundfish Data Bank, and
Groundfish Forum, Inc.***

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| OCEANA, INC., | No. 3:24-cv-00180-SLG |
| Plaintiff, | |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE, *et al.*, | |
| Defendants, | |
| and | |
| AT-SEA PROCESSORS ASSOCIATION, *et al.*, | |
| Intervenor-Defendants. | |

### AT-SEA PROCESSORS ASSOCIATION'S, ALASKA GROUNDFISH DATA BANK'S, AND GROUNDFISH FORUM, INC.'S RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT (L.R. 16.3(c)(2))

*Oceana, Inc. v. Nat'l Marine Fisheries Serv.*
Case No. 3:24-cv-00180-SLG

<u>**TABLE OF CONTENTS**</u>

I.     INTRODUCTION ........................................................................................... 1

II.   BACKGROUND .......................................................................................... 1

    A.    The Magnuson-Stevens Act and Regional Fishery Management
          Council Framework. .................................................................................. 1

    B.    The Sustainable Fisheries Act and The Designation of Essential Fish
          Habitat. ...................................................................................................... 3

    C.    Previous Five-Year EFH Reviews and Amendments to the Alaska
          FMPs. ....................................................................................................... 5

        1.    The 2005 Essential Fish Habitat EIS. ............................................. 5

        2.    The 2010 and 2017 Five-Year EFH Reviews. ................................. 6

    D.    The 2023 Five-Year EFH Review. ............................................................ 9

    E.    The 2024 EFH Omnibus Amendments to the Alaska FMPs and
          Oceana's Lawsuit. .................................................................................. 10

III.  STANDARD OF REVIEW ....................................................................... 11

IV.  ARGUMENT ........................................................................................... 12

    A.    Oceana Has Waived Any Claims Not Raised in Its Opening Brief. ........... 12

    B.    NMFS Rationally Concluded Based on the Best Available Science
          that the Impacts from Fishing on EFH are Minimal and Temporary. ......... 13

        1.    NMFS appropriately used Minimum Stock Size Threshold as
             one of several metrics to evaluate fishing effects. .......................... 13

        2.    NMFS appropriately used "Core EFH Area" to evaluate
             fishing effects. ............................................................................... 16

    C.    NMFS Reasonably Concluded that Current Management Measures
          are Sufficient to Conserve and Enhance EFH. .......................................... 19

        1.    The EFH regulations do not require *new* conservation and
             enhancement measures. .................................................................. 19

        2.    NMFS rationally concluded that existing management actions
             taken over the last two decades sufficiently conserve and
             enhance EFH. ................................................................................ 22

D.    NMFS Properly Relied on the Best Available Science to Support its Fishing Effects Assessment. ........................................................................ 24

    1.    The MSA and EFH regulations require that NMFS and the Council use the best available scientific information. .................... 24

    2.    NMFS considered information regarding the effects of fishing on EFH across multiple life stages and rationally explained its decision to combine data for certain life history stages. ................. 25

    3.    NMFS appropriately used its scientific expertise to incorporate longer recovery times and the depths of benthic features into the Fishing Effects model. ........................................... 27

E.    NMFS's Environmental Assessment Considered a Reasonable Range of Alternatives. ................................................................................ 30

    1.    An agency's obligation to consider alternatives in an Environmental Assessment is less rigorous than in an EIS, and NMFS appropriately considered a preferred alternative and a no action alternative. ............................................................. 31

    2.    Oceana's proposal to restrict fishing in the Gulf of Alaska does not meet the purpose and need of the EFH amendments action. ............................................................................................ 33

F.    Vacatur Is Not the Appropriate Remedy. .................................................... 35

V.    CONCLUSION ...................................................................................................... 36

# **TABLE OF AUTHORITIES**

**PAGE(S)**

**CASES:**

*American Oceans Campaign v. Daley*,
   183 F. Supp. 2d 1 (D.D.C. 2000) ................................................................. 21

*Cnty. of Amador v. U.S. Dep't of the Interior*,
   872 F.3d 1012 (9th Cir. 2017) .................................................................. 33

*Conservation Law Found. v. Ross*,
   374 F. Supp. 3d 77 (D.D.C. 2019) .................................... 3, 5, 11, 16, 28, 30, 34

*Earth Island Inst. v. U.S. Forest Serv. ("Earth Island I")*,
   697 F.3d 1010 (9th Cir. 2012) .................................................................. 31

*Earth Island Inst. v. U.S. Forest Serv. ("Earth Island II")*,
   87 F.4th 1054 (9th Cir. 2023) .................................................................. 31

*Friends of Del Norte v. Cal. Dep't of Transp.*,
   No. 18-CV-00129-JD, 2023 WL 2351649 (N.D. Cal. Mar. 3, 2023) ............................ 21

*HonoluluTraffic.com v. Fed. Transit Admin.*,
   742 F.3d 1222 (9th Cir. 2014) .................................................................. 31

*Idaho Farm Bureau Fed'n v. Babbitt*,
   58 F.3d 1392 (9th Cir. 1995) .................................................................. 36

*League of Wilderness Defs. v. U.S. Forest Serv.*,
   689 F.3d 1060 (9th Cir. 2012) .................................................................. 33

*Marsh v. Oregon Nat. Res. Council*,
   490 U.S. 360 (1989) .......................................................................... 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................... 11

*Nat. Res. Def. Council v. Evans*,
   254 F. Supp. 2d 434 (S.D.N.Y. 2003) .................................................... 19, 21, 27

*Oceana, Inc. v. Nat'l Marine Fisheries Serv.*

Case No. 3:24-cv-00180-SLG

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) ................................................................ 31

*Oceana, Inc. v. Evans*,
    384 F. Supp. 2d 203 (D.D.C. 2005) .......................................................... 34

*Oceana, Inc. v. Evans*,
    CIV.A.04-0811(ESH), 2005 WL 555416 (D.D.C. Mar. 9, 2005) ............ 33, 34

*Oceana, Inc. v. Pritzker*,
    24 F. Supp. 3d 49 (D.D.C. 2014) .......................................................... 12, 23

*Oceana, Inc. v. Raimondo*,
    530 F. Supp. 3d 16 (D.D.C. 2021) .................................................. 19, 21, 25

*Oceana, Inc. v. Raimondo*,
    2024 WL 3236723 (N.D. Cal. June 28, 2024) ....................................... 21, 23

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ................................................................... 11

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) .................................................. 11, 24, 25, 30

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
    608 F.3d 592 (9th Cir. 2010) ................................................................... 32

*The Ocean Conservancy v. Gutierrez*,
    394 F. Supp. 2d 147 (D.D.C. 2005) ...................................................... 19, 24

## STATUTES:

5 U.S.C. § 706(2)(A) ...................................................................................... 11

16 U.S.C. § 1801 ............................................................................................. 1

16 U.S.C. § 1802(10) ....................................................................................... 3

16 U.S.C. § 1851 .................................................................................... 2, 3, 24

16 U.S.C. § 1853(a)(7) ................................................................................... 20

*Oceana, Inc. v. Nat'l Marine Fisheries Serv.*
Case No. 3:24-cv-00180-SLG

16 U.S.C. § 1855(b)(2) ................................................................................ 3

Pub. L. 104-297, § 108, 110 Stat. 3559 ...................................................... 3

**REGULATIONS:**

50 C.F.R. § 600.305(a)(2) ............................................................................ 2

50 C.F.R. § 600.310(e)(1)(i)(A) ................................................................ 14

50 C.F.R. § 600.810 .................................................................................... 3

50 C.F.R. § 600.815 ........................................................ 4, 5, 20, 24, 25, 27

50 C.F.R. § 679.22 .................................................................................... 22

**OTHER AUTHORITIES:**

77 Fed. Reg. 66,564 (Nov. 6, 2012) ........................................................... 6

83 Fed. Reg. 31,340 (July 5, 2018) ............................................................. 9

# GLOSSARY OF TERMS

| | |
|---|---|
| AP | Advisory Panel |
| APA | Administrative Procedure Act |
| APU | Alaska Pacific University |
| BSAI | Bering Sea and Aleutian Islands |
| CEA | Core Essential Fish Habitat Area |
| EA | Environmental Assessment |
| EFH | Essential Fish Habitat |
| EIS | Environmental Impact Statement |
| FE | Fishing Effects |
| FMP | Fishery Management Plan |
| GMFMC | Gulf of Mexico Fishery Management Council |
| GOA | Gulf of Alaska |
| HAPC | Habitat Area of Particular Concern |
| LEI | Long-Term Effects Index |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| MSST | Minimum Stock Size Threshold |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| SFA | Sustainable Fisheries Act |
| SSC | Scientific and Statistical Committee |
| VMS | Vessel Monitoring System |

# I. INTRODUCTION

Every five years, the North Pacific Fishery Management Council ("the Council") in consultation with the National Marine Fisheries Service ("NMFS") reviews the best available science to determine if updates to Essential Fish Habitat ("EFH") designations are necessary for the Fishery Management Plans ("FMPs") regulating fishing in U.S. Federal waters off the coast of Alaska. After completing the most recent five-year review in 2023, the Council and NMFS amended the EFH provisions of the Alaska FMPs to incorporate new scientific information. Upset that NMFS did not include its proposal to restrict fishing in ninety percent of the Gulf of Alaska as part of its EFH update, Plaintiff Oceana, Inc., challenges the adoption of the EFH amendments and alleges that NMFS violated the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") and the National Environmental Policy Act ("NEPA").

At-Sea Processors Association, Alaska Groundfish Data Bank, and Groundfish Forum (collectively "Intervenor-Defendants") intervened in this case to defend the EFH amendments because Plaintiff's claims are irreconcilable with governing law and contradicted by an extensive administrative record that supports NMFS's reasoned scientific judgments. For the reasons discussed below, Intervenor-Defendants respectfully request that the Court deny Plaintiff's motion for summary judgment and grant Intervenor-Defendants' and Federal Defendants' cross-motions for summary judgment.

## II. BACKGROUND

### A. The Magnuson-Stevens Act and Regional Fishery Management Council Framework.

Marine fisheries management in U.S. Federal waters is governed primarily by the MSA.[1] Management under the MSA has been an open, transparent, and effective process

---

[1] 16 U.S.C. § 1801 *et seq.*

*Oceana, Inc. v. Nat'l Marine Fisheries Serv.*
Case No. 3:24-cv-00180-SLG

guided by science and collaboration among professional resource managers, regulators, and the public. Enacted in 1976, the MSA established eight regional fishery management councils comprised of members from commercial and recreational fishing interests as well as environmental, academic, and government representatives.[2] Among other responsibilities, the regional councils develop FMPs that comply with the MSA's requirements to promote sustainable fisheries.[3] The North Pacific Fishery Management Council is the regional council with "authority over the fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska."[4] In consultation with the Council, NMFS manages the highly productive groundfish fisheries off the coast of Alaska and ensures that the Council's proposed management measures comply with the MSA and its implementing regulations.[5] The Council's fishery management program is widely considered to be among the best in the world and has resulted in over 40 years of sustainable fisheries.[6]

FMPs are subject to the MSA's ten "national standards."[7] These standards require, among other things, that conservation and management measures "prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."[8] The standards also require that conservation and management measures

---

[2] *Id.* § 1852.

[3] *Id.* §§ 1852-1853.

[4] *Id.* § 1852(a)(1)(G).

[5] *Id.* § 1854; 50 C.F.R. § 600.305(a)(2).

[6] *See* SUPP00272 (citing N. Pac. Conservation and Spatial Mgmt. Areas in Alaska's EEZ (March 2023) ("NPFMC Conservation and Spatial Management Areas"), https://www.npfmc.org/wp-content/PDFdocuments/Publications/Conservation_Area_Summaries.pdf.

[7] 16 U.S.C. § 1851(a)(1)-(10); NMFS00699-700.

[8] 16 U.S.C. § 1851(a)(1). The "optimum yield" is the quantity of fish that "will provide the greatest overall benefit to the nation, particularly with respect to food production and

*Oceana, Inc. v. Nat'l Marine Fisheries Serv.*
Case No. 3:24-cv-00180-SLG

"be based upon the best scientific information available."[9]  Implementing FMPs that comply with the MSA's ten national standards is a complicated process that requires balancing multiple objectives.[10]

## B. The Sustainable Fisheries Act and The Designation of Essential Fish Habitat.

Recognizing the significance of healthy habitats to productive commercial and recreational fisheries, in 1996 Congress passed the Sustainable Fisheries Act ("SFA"),[11] which expanded the MSA's scope to include conservation measures aimed at protecting fish habitat.[12]  The SFA directed NMFS and the regional councils to describe and identify EFH for each FMP, defined as "those waters and substrate necessary to fish for spawning, breeding, feeding, or growth to maturity,"[13] as well as to minimize to the extent practicable the adverse effects of fishing on EFH and identify other actions to encourage the conservation and enhancement of EFH.[14]  Once NMFS has designated EFH for a species, federal agencies are required to consult with NMFS when authorizing, funding, or undertaking actions that may adversely affect EFH.[15]  During EFH consultations with federal action agencies, NMFS provides science-based non-binding conservation recommendations for mitigating potential project-related adverse effects on EFH.[16]

---

recreational opportunities, and taking into account the protection of marine ecosystems." *Id.* § 1802(33)(A).

[9] *Id.* § 1851(a)(2).

[10] *Conservation Law Found. v. Ross*, 374 F. Supp. 3d 77, 90 (D.D.C. 2019).

[11] Pub. L. 104-297, § 108, 110 Stat. 3559.

[12] NMFS00841.

[13] 16 U.S.C. § 1802(10); 50 C.F.R. § 600.810.

[14] NMFS00713.

[15] 16 U.S.C. § 1855(b)(2).

[16] NMFS00707; COUN05133.

*Oceana, Inc. v. Nat'l Marine Fisheries Serv.*
Case No. 3:24-cv-00180-SLG

After Congress enacted the SFA, NMFS developed regulations to assist the regional councils with describing and identifying as well as conserving and enhancing EFH.[17] The EFH regulations specified ten EFH components applicable to every FMP, several of which are particularly relevant to the current lawsuit.[18] For example:

- Component 1 requires that FMPs describe and identify EFH for each managed species using text and maps.[19]

- Component 2 directs councils "to prevent, mitigate, or minimize any adverse effects from fishing, *to the extent practicable*, if there is evidence that a fishing activity adversely affects EFH in a manner that is *more than minimal and not temporary in nature*."[20]

- Component 6 provides that "FMPs must identify actions to encourage the conservation and enhancement of EFH, including recommended options to avoid, minimize, or compensate for the adverse effects… especially in habitat areas of particular concern."[21]

- Component 10 provides that "Councils and NMFS should periodically review the EFH provisions of FMPs and revise or amend EFH provisions as warranted based on available information,"[22] and recommends a complete review of all EFH information every five years.[23]

---

[17] 50 C.F.R. § 600.815; NMFS00933.

[18] 50 C.F.R. § 600.815(a)(1)-(10); NMFS00713.

[19] 50 C.F.R. § 600.815(a)(1).

[20] *Id.* § 600.815(a)(2)(ii) (emphasis added).

[21] *Id.* § 600.815(a)(6).

[22] *Id.* § 600.815(a)(10).

[23] NMFS00713.

Based on the five-year review, councils may recommend FMP amendments to revise one or more EFH components within any of the FMPs under review.[24]  Significantly, the MSA's EFH provisions do not require that councils do everything they can to protect EFH, nor do they mandate that conservation of EFH take priority over the MSA's other management goals.[25]

## C.  Previous Five-Year EFH Reviews and Amendments to the Alaska FMPs.

### 1.  The 2005 Essential Fish Habitat EIS.

NMFS and the Council completed the first EFH review for the Alaska FMPs in 2005.[26]  The review was supported by a comprehensive Environmental Impact Statement ("EIS"),[27] which employed a new modelling tool, the Long-Term Effects Index ("LEI model"), to bring together available information on fishing gear types, fishing intensity, and gear impacts and recovery rates for different habitat types to help predict the effects of fishing on habitat.[28]  Despite some limitations, NMFS, the Council, and the Council's Scientific and Statistical Committee ("SSC") concluded that the LEI model incorporated the best available science and provided a reasonable approach to estimate and understand the impacts of fishing on habitat.[29]  The 2005 EIS considered numerous EFH management alternatives and the Council and NMFS ultimately adopted a series of FMP amendments. These amendments implemented a suite of EFH conservation measures restricting bottom

---

[24] NMFS04042A.  Any change to an FMP, regardless of how minor, requires an FMP amendment.  *Id.*

[25] *Ross*, 374 F. Supp. 3d at 91-92.

[26] NMFS00714.

[27] *See* NMFS00841-03290 (2005 EFH EIS and appendices).

[28] COUN09743-44.

[29] *Id.*

fishing in particularly sensitive habitat areas in the Bering Sea, Aleutian Islands, and in the Gulf of Alaska.[30]

## 2. The 2010 and 2017 Five-Year EFH Reviews.

NMFS completed subsequent five-year EFH reviews in 2010 and 2017.[31] Both reviews examined all ten EFH components and determined that new information justified updating some, but not all, of the components for the Alaska FMPs.[32] The 2010 review concluded that fishing was not affecting the capacity of EFH to support the life history processes of any species.[33] The 2010 review resulted in the Council and NMFS preparing an Environmental Assessment ("EA") and an omnibus amendment package in 2012 that revised the EFH sections for five of ten EFH components in the Alaska FMPs.[34]

The next five-year review was completed in 2017 and conducted in much the same way as the prior review, with the notable exception of two advances in the way that NMFS and the Council analyze fishing effects on habitat. First, NMFS collaborated with scientists at Alaska Pacific University ("APU") to develop the Fishing Effects model ("FE model"), an iterative modelling tool tracking habitat transitions between disturbed and undisturbed states.[35] Like the LEI model, the FE model estimates benthic habitat disturbance from commercial fishing activities, however several improvements in the FE model exponentially

---

[30] COUN09745; *see also* NMFS00841-850 (summarizing alternatives and implementing Alternative 5C with expanded closures in the Aleutian Islands and Gulf of Alaska).

[31] NMFS00714; COUN09745-46.

[32] *See* NMFS00720 (Table 3 Roadmap to Ten EFH Components).

[33] NMFS08502; COUN19243.

[34] NMFS04039A; *see also* NMFS03377 (2012 EFH EA updating EFH components 1, 2, 4, 8, and 9); 77 Fed. Reg. 66,564 (Nov. 6, 2012) (Final Rule approving EFH amendments for five Alaska FMPs).

[35] NMFS00781; NMFS08552; COUN09746; COUN19246.

increased the Council's and NMFS's ability to analyze the effects of fishing on habitat.[36] The FE model incorporated Vessel Monitoring System ("VMS") data that tracked nearly all commercial fishing vessels in the North Pacific allowing for a more accurate evaluation of fishing effort, distribution, and the effects of fishing.[37] The FE model also made significant advancements in habitat categorization,[38] incorporated updated fishing gear parameters and information regarding habitat susceptibility and recovery dynamics, and allowed scientists to evaluate fishing effects and recovery over specific time intervals.[39] The FE model was reviewed by the Council and its subcommittees,[40] submitted for public comment,[41] and ultimately celebrated by NMFS for having "greatly enhanced our ability to estimate and understand fishing impacts."[42]

The second significant improvement in the 2017 five-year review involved the development and adoption of a hierarchal "three-tiered" approach to evaluate whether fishing is adversely effecting EFH in a manner that is more than minimal and not temporary—the legal threshold for whether mitigation measures are needed.[43] This methodology was developed by an SSC subcommittee comprised of scientists and managers from the Alaska Fisheries Science Center, NMFS Alaska Region Office, and APU, and was

---

[36] NMFS00781; NMFS08561. The term "benthic" refers to anything associated with or occurring on the bottom of a body of water.

[37] NMFS05556; NMFS08561; COUN19246.

[38] The FE model divided habitat into 26 unique features as opposed to the four features of the LEI model. COUN19246.

[39] COUN19246; NMFS04100A; NMFS03363.

[40] NMFS04107A; COUN09749.

[41] *See* COUN19218 (summarizing public testimony on the FE model and noting the SSC's support for the FE model).

[42] NMFS03363.

[43] NMFS08559; COUN19277.

approved by the Council.[44]   The hierarchal approach considers impacts of commercial fishing, first, at the population level, and then uses objective criteria at the second and third levels to determine whether additional analysis is warranted to evaluate if habitat impacts are more than minimal or not temporary.[45]

To assist with this analysis, NMFS's stock assessment authors—the agency's foremost experts tasked with monitoring the health of a particular fish population—first consider the overall health of the population by examining the Minimum Stock Size Threshold ("MSST").  Next, the authors examine whether fishing activity is predicted to disturb more than ten percent of the species' most important "core" EFH area ("CEA").  Finally, the authors evaluate any relationships or plausible connections between species health (as measured by indices of growth-to-maturity, spawning success, breeding success, and feeding success) and reductions in habitat.[46]   If any of the three levels indicate a correlation between fishing impacts to EFH and effects on species health, stock assessment authors can elevate the relevant species to the SSC and the Council's Plan Teams for development of mitigation measures.[47]

After completing the 2017 five-year review and utilizing the new FE model and hierarchal methodology, NMFS and the Council determined "the effects of fishing on EFH do not currently meet the threshold of more than minimal and not temporary, and mitigation action is not needed at this time."[48]   Nevertheless, the Council and NMFS concluded that the best available science still warranted updating several of the other EFH components and

---

[44] COUN09755; COUN19280.

[45] NMFS08559.

[46] COUN09755-56.

[47] COUN19249-51.

[48] NMFS08561.

NMFS prepared an EA and omnibus amendment package updating the relevant EFH components for the Alaska FMPs.[49]

## D. The 2023 Five-Year EFH Review.

In April 2019, NMFS and the Council began the fourth comprehensive five-year EFH review process.[50] Like the previous reviews, the primary objective was to survey the ten EFH components for each of the Alaska FMPs and revise or amend those components as warranted based on available information.[51] Building on the foundation of the prior reviews, NMFS completed the review in February 2023. NMFS and Council staff prepared a 205-page analysis evaluating fishing effects on EFH and explaining several advancements in the FE model parameters.[52] These advancements included incorporating additional VMS fishing effort data, updating species distribution models and maps to more accurately reflect the waters where managed species live, improving gear tables to better reflect the fishing gear types used in Alaska's commercial fisheries, and revising sediment and habitat information to incorporate longer recovery times.[53] The improved FE model resulted in robust information on fishing impacts, susceptibility, and recovery time for 103 species.[54]

With a wealth of new data and applying the hierarchal approach, none of the stock assessment authors concluded that fishing effects on their species were more than minimal and not temporary.[55] Accordingly, none of the authors recommended elevating any

---

[49] *See* NMFS03301 (2018 EA updating EFH components 1, 2, 4, 8, and 9); 83 Fed. Reg. 31,340 (July 5, 2018) (Final Rule approving EFH amendments for five Alaska FMPs).

[50] FR00002; NMFS00706-840.

[51] COUN05289.

[52] NMFS05540-5744.

[53] NMFS00783-85; NMFS05554-64.

[54] NMFS05541.

[55] NMFS00780; NMFS05542.

*Oceana, Inc. v. Nat'l Marine Fisheries Serv.*
Case No. 3:24-cv-00180-SLG

managed species for possible mitigation.[56] After reviewing this comprehensive analysis of fishing effects, the SSC recommended "the current EFH methodology and FE estimates as a reasonable basis for the determination of fishing impacts," and concurred "that no species needs to be elevated for mitigation due to fishing impacts."[57] The SSC concluded that the fishing effects evaluation "supports the continued conclusion that the adverse effects of fishing activity on EFH are minimal and temporary in nature."[58]

**E.    The 2024 EFH Omnibus Amendments to the Alaska FMPs and Oceana's Lawsuit.**

Based on the 2023 five-year EFH review, "the Council concurred with the Plan Team and SSC consensus that the effects of fishing on EFH do not currently meet the threshold of more than minimal and not temporary, and that mitigation action is not needed at this time."[59] The Council also concluded that substantial new information was available to revise the EFH text and maps and several other EFH components for five of the Alaska FMPs and directed NMFS to prepare corresponding amendments for those FMPs.[60]

Just as it did after the previous five-year reviews, NMFS prepared a detailed EA for the EFH omnibus amendments, incorporating by reference the 2005 EFH EIS.[61] And just like the prior two EAs, the 2024 EA included two alternatives: (1) a preferred action alternative updating the applicable FMPs with the best available science from the five-year review process, and (2) a "no action" alternative which would maintain the status quo and

---

[56] NMFS00780.

[57] COUN01700.

[58] *Id.*

[59] NMFS00687; COUN05297.

[60] NMFS00652.

[61] NMFS00644-705; NMFS00654.

not update the relevant FMPs with new EFH information.[62]  NMFS published a proposed rule for the EFH amendments in April 2024 and after notice and comment, adopted the final EFH amendments in July 2024.[63]  Plaintiff filed this lawsuit in August 2024.[64]

## III.  <u>STANDARD OF REVIEW</u>

"Challenges under both the MSA and NEPA proceed under the Administrative Procedure Act's ("APA") familiar 'arbitrary and capricious' standard of review."[65]  The APA directs courts to "hold unlawful and set aside" an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[66]  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."[67]  APA review is highly deferential and the agency's decision is entitled to a presumption of regularity.[68]  "This traditional deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise."[69]  "In addition, courts pay agencies an extreme degree of deference when decisions involve complex judgments about sampling methodology and data analysis that are within the agency's technical expertise."[70]

---

[62] NMFS00655.

[63] FR00002; FR00005.

[64] Dkt. 1.

[65] *Ross*, 374 F. Supp. 3d at 88.

[66] 5 U.S.C. § 706(2)(A).

[67] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[68] *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).

[69] *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014).

[70] *Ross*, 374 F. Supp. 3d at 89 (internal quotations omitted).

# IV. <u>ARGUMENT</u>

Primarily attacking the methodology and metrics underlying NMFS's scientific judgments, Plaintiff alleges the agency's approval of the EFH amendments for the five FMPs violates the MSA and NEPA.[71]  Specifically, Plaintiff contends that NMFS (1) improperly concluded that effects of fishing were minimal and temporary and therefore do not require mitigation; (2) neglected to adopt measures to enhance and conserve EFH; (3) ignored available evidence related to long-lived habitat features and species life stages; and (4) did not consider a reasonable range of alternatives in adopting the EFH amendments.[72] Plaintiff's arguments are factually flawed and legally incorrect.  The voluminous administrative record demonstrates that the Council's and NMFS's adoption of the EFH amendments was well-reasoned, relied on the best available science, and complied with all relevant requirements of the MSA and NEPA.  NMFS's expert determinations are entitled to substantial deference, and the Court should decline Plaintiff's invitation to second-guess the methodology and data NMFS used to support its decision-making.

## A.    **Oceana Has Waived Any Claims Not Raised in Its Opening Brief.**

Count III of the First Amended Complaint alleges that NMFS violated NEPA by failing to analyze the impacts of the EFH amendments in an EIS.[73]  Plaintiff's opening brief does not pursue this claim, and it is therefore waived.[74]

---

[71] *See* Dkt. 16 (Amended Complaint) ¶¶ 1-2.

[72] Dkt. 31 at 23-40.

[73] Dkt. 16 ¶¶ 101-110.

[74] *See Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 65 n.12 (D.D.C. 2014) ("But because Oceana does not invoke this theory in its briefing, and because APA cases are decided entirely on cross-motions for summary judgment, the Court will consider Oceana's EIS theory waived.").

**B.    NMFS Rationally Concluded Based on the Best Available Science that the Impacts from Fishing on EFH are Minimal and Temporary.**

Plaintiff alleges that NMFS violated the MSA when it concluded that adverse effects from fishing on EFH are minimal and temporary and therefore do not require mitigation.[75] Plaintiff disagrees with two of the metrics—MSST and CEA—that NMFS used to help analyze the effects of fishing on EFH. Plaintiff's criticisms are misguided. NMFS is entitled to deference in selecting the appropriate methodology and metrics to assess fishing effects and Plaintiff's difference of opinion as to their suitability does not render the analysis arbitrary or capricious.

**1.    NMFS appropriately used Minimum Stock Size Threshold as one of several metrics to evaluate fishing effects.**

Plaintiff asserts that NMFS's reliance on MSST to evaluate adverse fishing effects is unlawful.[76] Rehashing 20-year-old criticisms, Plaintiff contends that "MSST is not a habitat indicator,"[77] and that by using MSST as part of its analysis of fishing impacts, NMFS has conflated an obligation to prevent overfishing with its responsibilities to conserve EFH.[78] Plaintiff's argument misapprehends the role of MSST in the hierarchal impact assessment methodology and disregards the substantial deference afforded to agencies in selecting the metrics and data analysis that are within the agency's technical expertise.

At the first step of the hierarchal analysis, NMFS's stock assessment authors consider whether the population is above or below the MSST—the level below which a stock is in jeopardy of not being able to produce its maximum sustainable yield on a continuing basis.[79]

---

[75] Dkt. 31 at 23-30.

[76] *Id.* at 28-30.

[77] *Id.* at 12-14, 28.

[78] *Id.* at 28-29.

[79] NMFS08560; EML04056; *see also* NMFS05568-70 (Stock Author Fishing Effects Assessment Process). The MSA regulations define maximum sustainable yield as "the

If the population is below MSST and there is a plausible connection to reductions of EFH as the cause, the stock assessment author recommends that the SSC and Plan Teams develop mitigation measures.[80]

Plaintiff's MSST argument resurrects the decades-old criticisms of three individuals who were involved in the peer review of the EFH EIS's fishing effects evaluation in 2004.[81] NMFS explained at length at the time why it disagreed with those criticisms—primarily because the reviewers mistakenly assumed that MSST was the *only* metric used to assess impacts to habitat.[82]  In response, NMFS noted, "the evaluations of habitat effects *were not limited to a[n] assessment of stock status relative to MSST, but considered a full set of more detailed information on stock status*," including detailed information that was not provided to the reviewers who had criticized MSST.[83]  NMFS also noted that downward trends in MSST related to poor recruitment can provide valuable information to scientists about habitat disturbances long before a stock is on the verge of collapse.[84]  NMFS ultimately made changes to the draft EIS to address the misconception that the fishing effects evaluation would rely on MSST alone.[85]

---

largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological, environmental conditions and fishery technological characteristics…, and the distribution of catch among fleets." 50 C.F.R. § 600.310(e)(1)(i)(A).

[80] COUN19293.

[81] Dkt. 31 at 12-13.

[82] COUN19284; *see also* NMFS03256-57 (NMFS response to comment regarding MSST as a tool to evaluate present sustainability of managed fisheries).

[83] COUN19284 (emphasis added).

[84] *See* NMFS03257 ("considering the ability of a stock to remain above MSST is not an insensitive measure of the response of the stock to habitat perturbations.").

[85] *See* NMFS02034 (2005 EFH EIS explaining "[g]iven the apparent confusion some commenters expressed over how [NMFS] considered stock status in the analysis, NMFS

Despite NMFS's response to comments explaining the utility of MSST, Plaintiff nonetheless argues that MSST is only useful for determining if a species is overfished and that, by using MSST, NMFS has reduced the MSA's EFH requirements to surplusage.[86] This argument reflects a fundamental misunderstanding of the hierarchal approach to assessing fishing impacts. MSST is not a proxy for determining habitat disturbance. It is one tool in a holistic and multilayered approach that looks at several quantitative and qualitative factors to assess fishing impacts. The administrative record explains "[t]he Fishing Effects analysis considers impacts of commercial fishing first at the *population level* [MSST]," precisely because "EFH is defined for *populations* managed by Council FMPs."[87] Significantly, the analysis of fishing impacts does not end with the consideration of MSST— the fishing effects analysis "then uses objective criteria to determine whether additional analysis is warranted to evaluate if habitat impacts caused by fishing are adverse and more than minimal or not temporary."[88] These objective criteria include the consideration of reductions to CEA, which are calculated by the sophisticated FE model and which, itself, considers multiple inputs including fishing intensity, habitat categorization (sediment type), susceptibility and recovery, and gear parameters.[89]

The Council and NMFS have determined that MSST is a useful criteria for evaluating impacts to EFH.[90] Tellingly, Plaintiff does not identify a metric that is better-suited to help

---

modified the analytical approach in the final EIS to address whether stock status and trends indicate any potential influence of habitat disturbance due to fishing.").

[86] Dkt. 31 at 29.

[87] COUN09755, 09757 (emphasis added).

[88] COUN09755.

[89] COUN09757-59.

[90] *See, e.g.*, COUN19292-93 (SSC recommending three-tiered methodology utilizing MSST); NMFS03257 (noting utility of MSST in gauging stock response to habitat disturbance).

*Oceana, Inc. v. Nat'l Marine Fisheries Serv.*
Case No. 3:24-cv-00180-SLG

decisionmakers evaluate fishing effects.[91] "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."[92] "In addition, courts pay agencies an extreme degree of deference when decisions involve complex judgments about sampling methodology and data analysis that are within the agency's technical expertise."[93] NMFS has more than adequately explained why MSST is a useful tool to evaluate fishing effects on EFH.

### 2. NMFS appropriately used "Core EFH Area" to evaluate fishing effects.

If the population is above MSST, the stock assessment authors next examine trends in the amount of disturbed habitat in the CEA—the top 50% of suitable habitat for each species and life stage based on its summer distribution.[94] To accomplish this, NMFS overlays species distribution models on the updated FE model to estimate species-specific habitat disturbance from fishing.[95] Based on this modelling, authors determine whether ten percent or more of the CEA for a given species would be impacted by commercial fishing activities.[96] "The 10 percent threshold was selected based on the assumption that impacts to less than 10 percent of CEA means more than 90% of the CEA … was undisturbed, and therefore represented minimal disturbance."[97] If ten percent or more of the CEA is impacted, stock assessment authors examine the several indices described above to determine whether there are any correlations between those parameters and the proportion of CEA impacted by

---

[91] *See* COUN19016 (noting alternative metrics are the subject of ongoing discussions).

[92] *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989).

[93] *Ross*, 374 F. Supp. 3d at 89 (internal quotations omitted).

[94] NMFS00687; EML03534.

[95] NMFS00687.

[96] NMFS08560.

[97] COUN20013.

fishing.[98]  If a statistically significant correlation exists, the authors elevate the affected species for development of mitigation measures.[99]

Plaintiff criticizes NMFS's use of CEA as inconsistent with the MSA.[100]  Plaintiff contends that CEA is a deficient metric because it (1) only analyzes fishing impacts to half of identified EFH, and (2) means that up to ten percent of the CEA can be affected without triggering an obligation to consider minimization of those effects.[101]  Plaintiff is mistaken on both counts.

*First*, the CEA metric does not ignore fishing impacts to half of EFH but rather focuses on disturbances to the *most* suitable habitat for each species.[102]  Almost all waters off the coast of Alaska are EFH for at least one species.[103]  NMFS and the Council considered using other percentages (25%, 50%, and 95%) for CEA and, after applying these different thresholds for several species, concluded that the 50% threshold was most reliable in terms of neither overstating nor understating habitat disturbance.[104]  Based on these observations,

_____

[98] COUN09756; NMFS08560.

[99] COUN09756; COUN10131.

[100] Dkt. 31 at 30-31.

[101] *Id.*

[102] By focusing on the most important EFH areas for each species, the CEA metric effectively *lowers* the habitat disturbance threshold for elevating a species for mitigation. For example, if a species had a total EFH area of 100 square miles, and mitigation were triggered by 10% habitat disturbance, 10 square miles of habitat would need to be disturbed before a species was automatically elevated for mitigation.  The CEA—making up the most important EFH areas for that same species—would be 50 square miles and automatic mitigation would be triggered if only 5 square miles of EFH is disturbed, making it a more sensitive metric that lowers the threshold for elevating a species for mitigation.

[103] NMFS00659.

[104] *See* COUN19293-95 (applying 25%, 50%, and 95% CEA quantiles to Pacific Ocean perch and red king crab); *see also* COUN19295 ("[t]he lower levels of apparent impact for the 25% and 50% quantiles are more representative of levels of impact to habitat truly essential for [the sampled species].").

*Oceana, Inc. v. Nat'l Marine Fisheries Serv.*
Case No. 3:24-cv-00180-SLG

the Council's Fishing Effects Subcommittee "continue[d] to recommend the 50% quantile to represent the 'core EFH' area to avoid the likelihood that important areas are excluded (if using the smaller area, 25% quantile) and to avoid statistically minimizing the amount of habitat reduction by using the larger, 95% quantile."[105]

**Second**, contrary to Plaintiff's contention, consideration of mitigation is not solely contingent on more than ten percent reduction in CEA. While exceeding the ten percent disturbance threshold results in a stock automatically being elevated for additional analysis and mitigation recommendations, stock assessment authors have the discretion to elevate a species for additional analysis and mitigation *even if less than ten percent of a species' CEA is projected to experience habitat disturbance*.[106] Indeed, "[t]he SSC subcommittee noted that the 10% threshold does not preclude stock assessment authors from completing the evaluation for levels of habitat disturbance less than 10%,"[107] leaving stock assessment authors free "to perform additional analysis if other data suggested that impacts may be affecting the population."[108]

Courts have previously rejected Plaintiff's efforts to dictate the data and metrics that NMFS uses to make highly technical management decisions implicating the agency's

---

[105] COUN19293-96; COUN19217.

[106] NMFS00687; NMFS00786.

[107] NMFS00687.

[108] *Id.*; *see also* NMFS780 (noting additional analysis available for species if CEA disturbance was greater than 10% "*or if the stock author chose to*") (emphasis added); NMFS05569 ("[Stock Authors] were not precluded from elevating a potential impact if they felt it was necessary for species below the ≥ 10% threshold.").

*Oceana, Inc. v. Nat'l Marine Fisheries Serv.*
Case No. 3:24-cv-00180-SLG

scientific expertise.[109]  Here, the Council and NMFS have rationally explained why MSST and CEA are useful metrics for evaluating habitat disturbance.  Nothing more is required.[110]

## C.  NMFS Reasonably Concluded that Current Management Measures are Sufficient to Conserve and Enhance EFH.

Plaintiff alleges that NMFS was required to develop and implement additional conservation and enhancement measures to compensate for adverse effects from fishing and non-fishing activities, irrespective of whether any such measures are actually necessary.[111]  According to Plaintiff, NMFS "was obligated to identify *other* measures to conserve and enhance EFH, but did not do so."[112]  Plaintiff's argument that the MSA requires every EFH amendment to include *new* conservation and enhancement measures is contrary to the plain text of the EFH regulations and disregards the agency's expert determination that existing management measures are sufficient to conserve and enhance EFH.

### 1.  The EFH regulations do not require *new* conservation and enhancement measures.

Plaintiff's assertion that each round of EFH amendments requires *new* conservation and enhancement measures in addition to existing measures is irreconcilable with the plain text of the EFH regulations.[113]  The MSA requires that FMPs "minimize to the extent

---

[109] *See Oceana, Inc. v. Raimondo*, 530 F. Supp. 3d 16, 30-32 (D.D.C. 2021) (rejecting Oceana's argument that NMFS should have relied on different data to assess dusky shark bycatch); *The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 157 (D.D.C. 2005) (noting the deference due to the agency when it provides a reasoned explanation for its choice of data).

[110] *See Nat. Res. Def. Council v. Evans*, 254 F. Supp. 2d 434, 441 (S.D.N.Y. 2003) (deferring to NMFS's expertise, supported by the record, that fishing activity did not have identifiable adverse effects on EFH).

[111] Dkt. 31 at 31-33.

[112] *Id.* at 32 (emphasis added).

[113] *Id.*

practicable adverse effects on habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat."[114]  The EFH regulations in turn provide that "FMPs must identify actions to encourage the conservation and enhancement of EFH, including recommended options to avoid, minimize, or compensate for [] adverse effects...."[115]  Plaintiff attempts to graft onto the EFH regulations a nonexistent requirement that NMFS identify *new* conservation and enhancement measures in addition to existing measures with each new round of EFH amendments.[116]  But the plain language of the MSA and the EFH regulations contains no such requirement so long as the relevant FMP "identifies actions to encourage the conservation and enhancement," of EFH.[117]  Plaintiff cannot credibly argue that the five FMPs subject to the challenged EFH amendments do not identify conservation and enhancement measures.[118]

Conspicuously absent from Plaintiff's argument is citation to *any* caselaw supporting its novel interpretation of the EFH regulations.[119]  Indeed, several courts have considered

---

[114] 16 U.S.C. § 1853(a)(7).

[115] 50 C.F.R. § 600.815(a)(6).

[116] Dkt. 31 at 32.

[117] 50 C.F.R. § 600.815(a)(6); *see also* 50 C.F.R. § 600.815(a)(2)(ii) (stating that "[a]mendments to the FMP or to its implementing regulations must ensure that the FMP *continues to minimize* to the extent practicable adverse effects on EFH caused by fishing.") (emphasis added).

[118] *See* NMFS00793-98 (identifying existing EFH habitat conservation measures); EML01161-65 (EFH Areas Protected from Fishing in the U.S. North Pacific); COUN21119-171 (Gulf of Alaska FMP Conservation and Management Measures); COUN20702-704 (Bering Sea and Aleutian Islands FMP EFH and HAPC conservation measures); COUN20272-305 (Arctic FMP Conservation and Management Measures); COUN20412-430 (Crab FMP Management Measures); COUN21558-651 (Salmon FMP EFH and HAPC Appendix).

[119] *See* Dkt. 31 at 31-33 (citing no cases supporting Argument III).

*Oceana, Inc. v. Nat'l Marine Fisheries Serv.*
Case No. 3:24-cv-00180-SLG

and rejected variations of Plaintiff's argument. In *American Oceans Campaign v. Daley*,[120] the District Court rejected Plaintiff's argument that the EFH amendment developed by the Gulf of Mexico Fishery Management Council ("GMFMC") and NMFS failed to minimize the adverse effects of fishing, holding NMFS's "conclusion that the EFH Amendment did not need to adopt new measures to mitigate the adverse effects of fishing, since existing management measures sufficiently mitigated those effects, and since the GMFMC lacked evidence of the adverse effects of a particular fishing practice on EFHs, was reasonable."[121]

In *Oceana, Inc. v. Raimondo*,[122] the District Court rejected Plaintiff's argument that NMFS was required to initiate consultation regarding adverse effects to EFH where the agency had already determined that existing management measures were sufficient.[123] Other courts have similarly concluded that NMFS need not impose additional conservation measures where existing measures are adequate or where there is no indication of adverse effects.[124] Plaintiff's opening brief offers no legal authority to the contrary.

---

[120] 183 F. Supp. 2d 1 (D.D.C. 2000). In 2002, Oceana merged with American Oceans Campaign. *See* Oceana–About Us, https://usa.oceana.org/about-us/.

[121] *Id.* at 13-14.

[122] No. 21-CV-05407-VKD, 2024 WL 3236723 (N.D. Cal. June 28, 2024).

[123] *See id.* at *14 ("NMFS need not adopt measures to minimize effects on EFHs when the available scientific evidence suggests no such measures are required or that sufficient measures are already in place.").

[124] *See, e.g. Nat. Res. Def. Council*, 254 F. Supp. 2d at 442 ("The Court finds that it was reasonable for Defendants not to impose new restrictions on bottom-tending mobile gear given the lack of evidence that the gear had an identifiable adverse effect."); *Friends of Del Norte v. Cal. Dep't of Transp.*, No. 18-CV-00129-JD, 2023 WL 2351649, at *4, *11 (N.D. Cal. Mar. 3, 2023) (rejecting argument that project sponsor violated MSA's EFH provisions where NMFS concluded that mitigation measures were sufficient to protect EFH and no additional practical measures could be taken).

## 2. NMFS rationally concluded that existing management actions taken over the last two decades sufficiently conserve and enhance EFH.

As part of the 2023 five-year EFH review, NMFS and the Council surveyed an extensive suite of existing habitat conservation and enhancement measures and considered whether new conservation and enhancement recommendations were warranted as part of the EFH amendments.[125] These existing measures include the establishment of numerous Habitat Protection Areas, Habitation Conservation Areas, Research Areas, Conservation Zones, and modified gear zones across vast areas of the North Pacific where bottom contact trawl gear is prohibited.[126] These measures encompass substantial management actions to protect EFH in the Gulf of Alaska.[127]

For example, the Council and NMFS implemented the Gulf of Alaska Slope Habitat Conservation Area establishing bottom trawl closure areas for vast stretches (totaling 2,112 square nautical miles) of slope from Yakutat to Unalaska to provide protection for vulnerable deep sea coral and sponge habitats.[128] In response to surveys revealing dense aggregations of Primnoa (red tree) corals in southeast Alaska, the Council and NMFS created the Gulf of Alaska Coral Habitat Protection Area.[129] Recognizing the significance of these corals in providing breeding areas, refuge, and rich feeding grounds for a wide variety of species including rockfish and crabs, this management action designated the coral area as a Habitat Area of Particular Concern ("HAPC") and prohibited the use of all bottom contact fishing

---

[125] *See* NMFS00793-98 (Existing EFH Habitat Conservation Measures).

[126] *See* EML01161-65 (EFH Areas Protected from Fishing in the U.S. North Pacific); *see also* NPFMC Conservation and Spatial Management Areas *supra* n.6.

[127] EML01164.

[128] 50 C.F.R. § 679.22(b)(10); EML01162; NPFMC Conservation and Spatial Management Areas at 11.

[129] 50 C.F.R. § 679.22(b)(9); EML01162-64; NPFMC Conservation and Spatial Management Areas at 10.

*Oceana, Inc. v. Nat'l Marine Fisheries Serv.*
Case No. 3:24-cv-00180-SLG

gear.[130]  All told, the Council and NMFS have enacted over a dozen different management measures closing hundreds of thousands of square nautical miles to bottom trawling off the coast of Alaska.[131]

NMFS rationally concluded that these comprehensive existing management measures are sufficient to conserve and enhance EFH, noting "[t]he Council and NMFS have several management measures in place, including habitat area closures and [HAPCs], which meet the requirements of EFH component 6."[132]  This determination implicates NMFS's scientific expertise and the Court should decline Plaintiff's invitation to second-guess the adequacy of these measures.[133]

---

[130] *Id.*

[131] EML01161-65.

[132] FR00003. Plaintiff's suggestion that the Council disregarded the Advisory Panel's ("AP") recommendation to adopt new conservation and enhancement measures mischaracterizes the record.  Dkt. 31 at 32.  The language cited by Plaintiff is from the rationale supporting an amendment to an AP motion recommending that the Council initiate the process of updating the FMPs based on the 2023 five-year review.  COUN03497.  The AP declined to include this language when it recommended that the Council adopt the EFH amendments ten months later.  COUN05302.

[133] *See Pritzker*, 24 F. Supp. 3d at 59 ("[I]n the context of judicial review of an FMP, [i]t is therefore especially appropriate for the Court to defer to the expertise and experience of those individuals and entities—the Secretary, the Councils, and their advisors—whom the [MSA] charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors.") (internal quotations omitted); *see also Oceana, Inc. v. Raimondo*, 2024 WL 3236723, at *14 (finding NMFS's assessment that sufficient measures were in place to protect EFH was rationally connected to evidence in the record and consistent with the MSA).

**D.      NMFS Properly Relied on the Best Available Science to Support its Fishing Effects Assessment.**

Plaintiff alleges that NMFS violated the MSA by disregarding available evidence in its fishing effects assessment.[134]   Specifically, Plaintiff contends that NMFS neglected to consider information demonstrating subadult and juvenile fish rely on benthic habitat features.[135]   Plaintiff also asserts that NMFS ignored evidence that important structure forming habitat features reside at depths shallower than 300 meters and take more than 50 years to recover.[136]   Plaintiff's arguments ignore extensive explanations in the administrative record detailing why the Council and NMFS used the data and methodology that it did, and misconstrues the best available science standard and the deference afforded to the agency in determining what the best available science is.

**1.      The MSA and EFH regulations require that NMFS and the Council use the best available scientific information.**

The MSA and the EFH regulations both require that conservation and management measures be based upon the best scientific information available.[137]   "The purpose of the best available science standard is to prevent an agency from basing its action on speculation and surmise.   Under this standard, an agency must not disregard available scientific evidence that is in some way better than the evidence [it] relies on.   The standard does not, however, require an agency to conduct new tests or make decisions on data that does not yet exist."[138]   The best available science standard "does not

---

[134] Dkt. 31 at 31-36.

[135] *Id.* at 35-36.

[136] *Id.* at 33-35.

[137] 16 U.S.C. § 1851(a)(2); 50 C.F.R. § 600.815(a)(2)(i).

[138] *Locke*, 776 F. 3d at 995 (internal quotations and citations omitted, brackets in original); *see also Gutierrez*, 394 F. Supp. 2d. at 157 ("[T]he [NMFS must] utilize the best scientific data *available,* not the best scientific data *possible.*") (emphasis in original).

require the NMFS to rely upon perfect or entirely consistent data, but rather is a practical standard requiring only that fishery regulations be diligently researched and based on sound science."[139] "[W]hat constitutes the best scientific and commercial data available is itself a scientific determination deserving of deference."[140]

### 2. NMFS considered information regarding the effects of fishing on EFH across multiple life stages and rationally explained its decision to combine data for certain life history stages.

Plaintiff's argument that NMFS neglected to consider the effects of fishing on habitat essential for subadults and juvenile fish disregards the administrative record and misinterprets the best available science standard.[141]

The EFH regulations specify four different levels (1 through 4) for regional management councils and NMFS to use for organizing the information necessary to describe and identify EFH.[142] Each level corresponds to the availability of data about a particular species or life stage with Level 4 representing the highest quality data in terms of detail.[143] Councils strive to describe habitat based on the highest level of detail available.[144] To the extent possible, NMFS identifies the level of information for each species at the early juvenile, subadult, and adult life stages, however, where information on a given species or life stage is lacking, "and habitat usage cannot be inferred from other means, *such as information on a similar species or another life stage*, EFH should not be designated."[145]

---

[139] *Raimondo*, 530 F. Supp. 3d at 29 (internal quotations omitted).

[140] *Locke*, 776 F. 3d at 995.

[141] Dkt. 31 at 35.

[142] 50 C.F.R. § 600.815(a)(1)(iii); NMFS00726-27; *see also* NMFS08221 (App'x A Definitions of EFH Levels).

[143] NMFS08221; 50 C.F.R. § 600.815(a)(1)(iii)(A)(1)-(4).

[144] 50 C.F.R. § 600.815(a)(1)(iii)(B).

[145] *Id.* (emphasis added).

Selectively citing out of context the SSC's observation of "the apparent mismatch between the multiple life stages for which EFH has been defined and the evaluation of fishing effects for only adult life stages,"[146] Plaintiff misleadingly suggests that NMFS disregarded information about subadult and juvenile fish life stages in designating EFH. Placed in context, the cited document *explains* that data limitations for juvenile and subadult life stages necessitated combining data across species' life history to adequately determine EFH and the SSC's *support* for this approach.[147]   Indeed, the SSC acknowledged that additional information was needed for certain species and life stage combinations that were poorly represented in survey data, but that "changing [species distribution models] was not possible under the proposed timeline due to resource limitations."[148]   Accordingly,

> **[t]he SSC suggests consideration during the next 5-year EFH review cycle of whether subsequent evaluation should consider other life stages for which EFH has been defined,** with explicit consideration of whether [species distribution model]-based EFH definitions for other life stages are sufficiently representative for FE evaluation given potential limitations in the data available to inform EFH definitions for earlier life stages.[149]

NMFS heeded the SSC's advice, noting in its response to comments that collecting and incorporating additional data about juveniles and subadults was an "ongoing research priority for future reviews."[150]

---

[146] Dkt. 31 at 35 (citing COUN03445).

[147] *See* COUN03437 (noting additional information is needed for some species and life stages that are poorly represented in survey data and determinations for juvenile and subadult life stages may not be possible); *see also* NMFS03445 ("The SSC supports EFH and FE evaluation for species complexes or by combining data across species' life history stages as necessary to adequately determine EFH and evaluate fishing effects.").

[148] COUN03437.

[149] COUN03445 (bold in original).

[150] FR00002-03.

*Oceana, Inc. v. Nat'l Marine Fisheries Serv.*
Case No. 3:24-cv-00180-SLG

Plaintiff mischaracterizes the agency's response as a "future promise of compliance with the law,"[151] but this criticism is misplaced and misconstrues the best available science standard. NMFS is not required to have perfect data on all species across all life stages, nor is the agency required to perform additional science or modelling that it lacks the time and resources to complete.[152] NMFS complied with the MSA's requirements to use the best scientific information available as part of the EFH review process. The administrative record rationally explains why NMFS combined data across species' life stages to account for data limitations for certain species at the juvenile and subadult life stages.[153] This comports with the best available science standard and with the EFH regulations' guidance that EFH can properly be inferred from another life stage where information is lacking.[154]

### 3. NMFS appropriately used its scientific expertise to incorporate longer recovery times and the depths of benthic features into the Fishing Effects model.

Plaintiff argues that NMFS's fishing effects analysis failed to properly account for longer recovery times and the depths of benthic features.[155] Plaintiff contends that the agency's FE model disregarded the presence of certain corals, sponges, and sea pens at depths shallower than 300 meters, and that these habitat features are slower to recover from disturbance than the FE model accounts for.[156] According to Plaintiff, these supposed shortcomings underrepresent the impacts of fishing and render the entire fishing effects

---

[151] Dkt. 31 at 35.

[152] *See Nat. Res. Def. Council*, 254 F. Supp. 2d at 440 ("Since neither the [MSA] nor the [EFH] regulation requires the Council to affirmatively conduct research to better identify EFHs and the adverse effects of fishing on them, reliance on the best *available* scientific information is sufficient.") (citation omitted, emphasis in original).

[153] COUN03437-45.

[154] 50 C.F.R. § 600.815(a)(1)(iii)(B).

[155] Dkt. 31 at 33-35.

[156] *Id.* at 33-34.

analysis arbitrary and capricious.[157]   Again, the administrative record provides reasoned explanations for the depths, recovery times, and substrates that NMFS used in the FE model. While Plaintiff may prefer that NMFS use different metrics to make the effects of fishing seem greater than they actually are, such scientific judgments related to the FE model are squarely within the agency's expertise and are entitled to deference.

The incorporation of longer recovery times was one of several advancements in the FE model from the prior five-year EFH review.[158]   In response to SSC concerns that the longest recovery time incorporated into the prior version of the FE model may not capture the recovery time needed for long-lived species—in particular hard corals found on rocky substrate at deep depths—NMFS added a deep and rocky substrate category with a recovery time of 10-50 years to the updated FE model.[159]   Nevertheless, Plaintiff argues that NMFS should have instead used more conservative recovery times to account for coral that may need 100 years or more to fully recover.[160]   But the administrative record explains in technical detail the calculations used by NMFS to determine the proper recovery interval and why this interval is appropriately representative for the long-lived species category in the FE model.[161]   This scientific determination is precisely the type of judgment that NMFS is entrusted to make and for which it is entitled to substantial deference.[162]

---

[157] *Id.* at 34-35.

[158] NMFS00784.

[159] COUN09752-53; COUN10126-27.

[160] Dkt. 31 at 8, 34.

[161] *See* COUN09794 (incorporation of longer recovery time into FE model formula); COUN10126-27 (inclusion of long-lived species on deep and rocky habitats); COUN10157-59 (explaining how the FE model computes the amount of recovery time based on sediment class); COUN10159 (noting the mean recovery time for long-lived species is 22.5 years).

[162] *See Ross*, 374 F. Supp. 3d at 110 ("The weighing of relevant factors is a judgment left to the Agency. That [plaintiff] would have reached a different conclusion is of little moment under [the arbitrary and capricious] standard of review.").

Plaintiff's argument that NMFS discounted evidence of long-lived habitat features at depths shallower than 300 meters similarly fails.[163] Again, NMFS rationally explained why it used a 300-meter depth, finding the highest density of long-lived corals at depths of 400–700 meters, but nonetheless using a more conservative depth of 300 meters to be precautionary.[164] Significantly, NMFS's assumptions regarding coral and sponge distribution depths were "validated with visual observations in the field that confirmed that coral and sponge ecosystems occur at predictable locations."[165]

Plaintiff contends that NMFS should have incorporated unvalidated "evidence" of corals and sponges occurring at depths shallower than 300 meters.[166] But agency experts explained that Plaintiff's preferred coral and sponge distribution models for the Gulf of Alaska had not yet been validated.[167] While Plaintiff may favor incorporating unvalidated deep sea coral and sponge distribution models into the FE model,[168] it is within the agency's

---

[163] Dkt. 31 at 34.

[164] NMFS00784; COUN09752; NMFS05561.

[165] EML00897; *see also* NMFS00784 (noting video analysis of NMFS surveys confirmed highest densities at depths from 400–700 meters with bedrock or cobble substrates).

[166] Dkt. 31 at 33-34.

[167] *See* EML00894-95 (responding to Oceana's inquiry about the FE model's coral depth metrics by noting Gulf of Alaska coral and sponge distribution models have not been systematically validated to same extent as the Bering Sea and requesting Oceana's support for validating GOA models); *see also* COUN09765 (Validation of Coral and Sponge Modeling in the GOA); COUN03443 (SSC recommendation that NMFS "incorporate results from the 2020-2024 Alaska Deep-Sea Coral and Sponge Initiative, *when available...*") (emphasis added); COUN05002, 05011 (updating Council on 2020-2024 Deep Sea Coral & Sponge Initiative and GOA model validation progress).

[168] *See* NMFS11166 (Oceana comment letter noting "we disagree with the analysts' recommendation that integrating the coral and sponge habitat models for the Gulf of Alaska should be postponed."); *see also* EML01158 (email from NMFS scientist noting Oceana "want[s] best available science, except waiting for validated coral and sponge models is a no go.").

discretion to determine what constitutes the best available science.[169]  NMFS appropriately used its expertise to incorporate validated data into the FE model indicating the highest density of corals and sponges at depths of 400–700 meters.  "The fact that the Service plainly has a rational basis for its determination supported by facts found and explained in the record, even if its conclusion is not the one [plaintiff] prefers, is sufficient to uphold this action."[170]  Accordingly, summary judgment in favor of Intervenor-Defendants and Federal Defendants is appropriate on this claim.

## E.    NMFS's Environmental Assessment Considered a Reasonable Range of Alternatives.

The EA supporting the EFH Amendments evaluated two alternatives: (1) a preferred alternative that would amend the applicable FMPs to incorporate the updated EFH information based on the best available science identified during the 2023 five-year review, and (2) a "no action" alternative, which would maintain the status quo, and not update the EFH provisions of the FMPs with new information.[171]  Disappointed that the Council and NMFS did not advance Oceana's proposal to restrict bottom trawling in *ninety percent* of the Gulf of Alaska as part of the effort to update EFH information for the relevant FMPs,[172] Plaintiff contends that NMFS failed to consider a reasonable range of alternatives in violation of NEPA.[173]  Extensive legal authority provides that an EA considering only a preferred alternative and a no action alternative complies with NEPA, especially where the agency determines that the action will not have significant environmental impacts.  Further,

---

[169] *Locke*, 776 F. 3d at 995.

[170] *Ross*, 374 F. Supp. 3d at 110.

[171] NMFS00655.

[172] *See* COUN05170 ("…with this proposal 90% of the Gulf of Alaska proposal area would be protected year-round from groundfish bottom trawling, totaling 871,556km$^2$.").

[173] Dkt. 31 at 36-40.

NEPA does not require that agencies consider unreasonable alternatives that do not meet the purpose or need of the proposed action.

> **1.    An agency's obligation to consider alternatives in an Environmental Assessment is less rigorous than in an EIS, and NMFS appropriately considered a preferred alternative and a no action alternative.**

Under NEPA, "[j]udicial review of the range of alternatives considered by an agency is governed by a rule of reason that requires an agency to set forth only those alternatives necessary to permit a reasoned choice."[174]   There is no "minimum number of alternatives that an agency must consider,"[175] and the Ninth Circuit has "join[ed] our sister circuits in holding that an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS."[176]   In reviewing the sufficiency of the alternatives considered in an EA, the Ninth Circuit has "repeatedly held that an agency satisfies NEPA when it considers only two alternatives—action and no action."[177]

An EA's consideration of just two alternatives is especially appropriate where the agency determines that the action would not have significant environmental effects.[178]   In *Earth Island Institute v. United States Forest Service*,[179] the Ninth Circuit held that "it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined, through its decision not to file an impact statement, will have no significant environmental effects anyway."[180]   That is precisely the

---

[174] *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1231 (9th Cir. 2014).

[175] *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005).

[176] *Id.*

[177] *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023) ("*Earth Island II*").

[178] *Id.* at 1066.

[179] 697 F.3d 1010 (9th Cir. 2012) ("*Earth Island I*").

[180] *Id.* at 1023.

situation here. After completing its EA, NMFS prepared a Finding of No Significant Impact ("FONSI") for the EFH amendments,[181] concluding that the action was minor in scale, was not expected to result in any significant impacts to marine resources or parts of the human environment, and would simply benefit species and fisheries management by incorporating more accurate EFH information.[182] Plaintiff does not challenge this determination or the issuance of a FONSI.[183] The Ninth Circuit has consistently held that agencies comply with NEPA when they consider only two alternatives in similar circumstances, and this Court should do the same.[184]

In addition to satisfying the requirements of NEPA, the EA's consideration of two alternatives is consistent with prior agency practice for the 2012 and 2018 EFH amendments, where NMFS prepared EAs considering preferred and no action alternatives that are functionally identical to the alternatives in the 2024 EA.[185] Ironically, in 2018 Plaintiff found these same two alternatives sufficient and *encouraged* NMFS to select the preferred alternative.[186] The Ninth Circuit has cautioned, "[a] court should hesitate before construing

---

[181] NMFS00011-16.

[182] NMFS00012.

[183] *See* Part IV.A *supra*.

[184] *See Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 602 n.11 (9th Cir. 2010) ("[t]o the extent that [Plaintiff] is complaining that having only two final alternatives—no action and a preferred alternative—violates [NEPA's] regulatory scheme, a plain reading of the regulations dooms that argument.").

[185] *See* NMFS03310 (description of alternatives in 2018 EA); NMFS03385 (description of alternatives in 2012 EA).

[186] *See* COUN20254 ("Oceana recommends that the Council select Alternative 2 for each of the 8 action items in the EFH Omnibus Amendment package…. We support the EFH conservation actions taken by the NPFMC thus far, and urge the agency to select Alternative 2.").

*Oceana, Inc. v. Nat'l Marine Fisheries Serv.*
Case No. 3:24-cv-00180-SLG

a statute in a way that renders years of consistent agency practice unlawful,"[187] and this Court should decline Plaintiff's invitation to do so here.

> **2.    Oceana's proposal to restrict fishing in the Gulf of Alaska does not meet the purpose and need of the EFH amendments action.**

Even if NEPA obliged NMFS to consider more than two alternatives in the EA, NMFS still had no obligation to consider Plaintiff's proposal because it does not meet the purpose and need of the EFH amendments action.  Courts analyze the reasonableness of an alternative with reference to the stated purpose and need of the agency action and an "agency need only evaluate alternatives that are reasonably related to the purposes of the project."[188] "The identification of what particular combination of alternatives protects EFH and therefore warrants detailed consideration lies within the Secretary's 'area of special expertise' and is entitled to deference."[189]

The purpose of the EFH omnibus amendments is to comply with the MSA's EFH provisions by updating the five Alaska FMPs to reflect new information from the 2023 five-year review.[190]  Plaintiff does not dispute the purpose and need statement is appropriate.[191] Rather, Plaintiff argues that its proposal to restrict fishing in 90 percent of the Gulf of Alaska is reasonable because it invokes a single EFH component.[192]  Plaintiff is mistaken.

---

[187] *Cnty. of Amador v. U.S. Dep't of the Interior*, 872 F.3d 1012, 1024 (9th Cir. 2017).

[188] *League of Wilderness Defs. v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012) (internal quotations omitted).

[189] *Oceana, Inc. v. Evans*, CIV.A.04-0811(ESH), 2005 WL 555416, at *35 (D.D.C. Mar. 9, 2005).

[190] *See* NMFS00652 (Purpose and Need Statement).

[191] Dkt. 31 at 38-40.

[192] *Id.* at 38-39.

Here, NMFS examined all ten EFH components as part of the five-year review process.[193] That review ultimately reflected a need to update several, but not all, EFH components for five different FMPs.[194] Notably, the best available science *did not* reflect a need for additional conservation measures beyond the extensive habitat protection measures already in place.[195] Plaintiff's proposal, however, offered only conservation measures—and extreme ones at that—for a single FMP making it pertinent to only a tiny fraction of the issues addressed though the five-year review process and irrelevant to the components that the review indicated actually needed updating.[196] Courts have observed "[t]he [MSA's EFH] provision does not require Councils to do everything they can to protect essential fish habitat"[197] and have previously cautioned "Oceana's singular focus on alternatives that close fishing grounds in order to protect EFH ignores [the MSA's] statutory mandates and effectively reads 'practicable' out of the MSA."[198] This Court should similarly reject the argument that NMFS violated NEPA by not advancing Plaintiff's misguided proposal that does not satisfy the purpose or need of the EFH amendments action.[199]

---

[193] *See* FR00003 (noting the five-year review examined "each of the 10 EFH components in detail" and "focused on issues ripe for decision during this review period.").

[194] *See* NMFS00649 (ES Table 1) (identifying new information warranting updates to EFH Component 1 (EFH descriptions and identification), Component 2 (fishing activities that may adversely affect EFH), Component 4 (non-fishing activities that may adversely affect EFH), Component 7 (prey species lists and locations), and Component 9 (research and information needs) for the five FMPs).

[195] *See* NMFS00793-98 (surveying existing conservation and enhancement measures); FR00003 (concluding existing management measures satisfy the conservation and enhancement requirements of EFH component 6).

[196] *Id.*; COUN05158.

[197] *Ross*, 374 F. Supp. 3d at 91 (citations omitted).

[198] *Oceana, Inc. v. Evans*, 2005 WL 555416, at *35.

[199] *See Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 240, 243-44 *order clarified*, 389 F. Supp. 2d 4 (D.D.C. 2005) ("plaintiff is essentially arguing that the 'reasonable range of

Oversimplifying complex fisheries management decisions, Plaintiff also contends that its proposal to restrict fishing in the Gulf of Alaska is reasonable because the Council and NMFS previously implemented closures in the Bering Sea and Aleutian Islands ("BSAI").[200]  Plaintiff ignores the specific circumstances justifying the conservation measures established for the BSAI, as well as the contemporaneous decision to implement closures—albeit narrower ones—for sensitive habitat areas in the Gulf of Alaska.[201]  EFH conservation measures are not one-size-fits-all and what might be suitable in the BSAI is not necessarily appropriate for management in the Gulf of Alaska's unique ecosystem. Indeed, the significant differences between the ecosystems of the Gulf of Alaska and the BSAI are reflected by the fact that the groundfish fisheries for these two distinct regions are managed under two separate FMPs.[202]

In sum, the EA considered a reasonable range of alternatives and NMFS was not obliged to consider Plaintiff's proposal that does not meet the purpose and need of the EFH amendments action.  Summary judgment in favor of Intervenor-Defendants and Federal Defendants on Plaintiff's NEPA claim is appropriate.

## F.    Vacatur Is Not the Appropriate Remedy.

Walking back the relief requested in its Amended Complaint (vacatur of the EFH amendments and supporting EA, and a new NEPA analysis to be completed within one year of the Court's decision),[203] Plaintiff's opening brief instead seeks remand to the agency with

---

alternatives' required under NEPA must include Oceana's proposals…. a failure to implement Oceana's exact proposals is not sufficient to invalidate the EIS.").

[200] Dkt. 31 at 37.

[201] EML01162.

[202] *See* COUN20581 (BSAI FMP); COUN21101 (GOA FMP).

[203] Dkt. 16 at 25.

*Oceana, Inc. v. Nat'l Marine Fisheries Serv.*
Case No. 3:24-cv-00180-SLG

instructions from the Court that NMFS rectify any deficiencies within 18 months.[204]  In the event that the Court finds any merit to Plaintiff's claims—and it should not—Intervenor-Defendants agree that remand to the agency without vacatur would be appropriate.[205]

## V.   CONCLUSION

NMFS rationally exercised its expertise to evaluate the effects of fishing on EFH and its methodology, metrics, and reasoned scientific judgements are entitled to substantial deference.  Furthermore, the EA considered a reasonable range of alternatives and NMFS was not obliged to advance Plaintiff's proposal that does not meet the purpose and need of the action.  For the reasons set forth above, Intervenor-Defendants respectfully request the Court deny Plaintiff's motion for summary judgment and grant Intervenor-Defendants' and Federal Defendants' cross-motions for summary judgment.

DATED this 20th day of June, 2025.

SUMMIT LAW GROUP, PLLC

s/ James C. Feldman
James C. Feldman (AK Bar No. 1702003)
jamesf@summitlaw.com
Eva Sharf Oliver (*Pro Hac Vice*)
evao@summitlaw.com

*Attorneys for At-Sea Processors Association, Alaska Groundfish Data Bank, and Groundfish Forum, Inc.*

---

[204] Dkt. 31 at 40-41.

[205] *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures.").

## **CERTIFICATE OF COMPLIANCE WITH WORD LIMITS**

I certify that this document contains 9,993 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

_s/ James C. Feldman_

James C. Feldman

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 20, 2025, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. Participants in this Case No. 3:24-cv-00180-SLG who are registered CM/ECF users will be served by the CM/ECF system.

SUMMIT LAW GROUP, PLLC


 *s/ Denise Brandenstein*
Denise Brandenstein, Legal Assistant
**deniseb@summitlaw.com**