Charisse Arce
Maile Tavepholjalern
EARTHJUSTICE
310 K Street, Suite 508
Anchorage, AK 99501
T: 907.277.2500
E: carce@earthjustice.org
E: mtave@earthjustice.org

Katharine S. Glover
Eric P. Jorgensen
EARTHJUSTICE                              Andrea A. Treece (*pro hac vice*)
325 Fourth Street                         EARTHJUSTICE
Juneau, AK 99801                          50 California Street, Suite 500
T: 907.586.2751                           San Francisco, CA 94111
E: kglover@earthjustice.org               T: 415.217.2089
E: ejorgensen@earthjustice.org            E: atreece@earthjustice.org

*Attorneys for Plaintiff Oceana, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| OCEANA, INC., | ) |
|     *Plaintiff*, | ) |
| | ) |
| v. | ) Case No. 3:24-cv-00180-SLG |
| | ) |
| NATIONAL MARINE FISHERIES SERVICE *et al.*, | ) |
| | ) |
|     *Defendants*, | ) |
| | ) |
|     and | ) |
| | ) |
| AT-SEA PROCESSORS ASSOCIATION *et al.*, | ) |
| | ) |
|     *Intervenor-Defendants*. | ) |

## PLAINTIFF'S REPLY BRIEF UNDER LOCAL CIVIL RULE 16.3(c)(3)

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT....................................................................................................... 1

I.     Oceana has standing. ................................................................................ 1

II.    The Service has not justified its failure to meet its continuing obligation to
       consider minimization measures, and its broader obligation to consider
       conservation and enhancement measures.................................................. 5

       A.     A five-year EFH review includes obligations to assess adverse
              fishing effects and consider conservation measures. .................... 5

       B.     The two primary factors the Service uses to determine adverse
              effects are unlawful. ................................................................. 10

              1.     The use of MSST fails to meet the legal standard required by
                     the MSA. .......................................................................... 11

              2.     Congress did not give the Service discretion to assess impacts
                     to only some of the EFH it has designated........................... 13

              3.     The discretion to consider other information does not rescue
                     the process. ...................................................................... 15

       C.     The Service's fishing effects decision is arbitrary because it ignored
              available evidence. .................................................................... 16

              1.     The Service failed to consider available evidence showing
                     benthic habitat features are long-lived and exist at shallow
                     depths. ............................................................................. 17

              2.     The Service failed to assess adverse effects to the habitat
                     species of all life stages use. ............................................. 19

III.   The Service arbitrarily failed to consider a reasonable range of alternatives
       in violation of NEPA and the APA. ...................................................... 21

       A.     Oceana's proposal is consistent with the Service's stated purpose
              and need..................................................................................... 21

B. The Service's exclusion of Oceana's proposal was arbitrary. .................... 24

C. The Service's and Intervenor-Defendants' other arguments concerning alternatives lack merit ................................................. 25

CONCLUSION ....................................................................................................... 26

CERTIFICATE OF COMPLIANCE WITH WORD LIMITS ......................................... 28

CERTIFICATE OF SERVICE ..................................................................................... 29

# TABLE OF AUTHORITIES

## CASES

*American Oceans Campaign v. Daley*,
  183 F.Supp.2d 1 (D.D.C. 2000) ............................................................ 2, 3, 4, 8

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
  538 F.3d 1172 (9th Cir. 2008) .................................................................... 26

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
  2025 WL 1669344 (9th Cir. June 13, 2025) ........................................... 21, 23

*Earth Island Inst. v. U.S. Forest Serv.*,
  87 F.4th 1054 (9th Cir. 2023) ..................................................................... 23

*Env't Def. Ctr. v. BOEM*,
  36 F.4th 850 (9th Cir. 2022) ....................................................................... 19

*Flaherty v. Bryson*,
  850 F.Supp.2d 38 (D.D.C. 2012) .................................................................. 2

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
  528 U.S. 167 (2000) ...................................................................................... 2

*Friends of Del Norte v. California Department of Transportation*,
  2023 WL 2351649 (N.D. Cal. Mar. 3, 2023) ................................................ 8

*Gulf Restoration Network, Inc. v. National Marine Fisheries Service*,
  730 F.Supp.2d 157 (D.D.C. 2010) ................................................................ 3

*Hualapai Indian Tribe v. Haaland*,
  755 F.Supp.3d 1165 (D. Ariz. 2024) .......................................................... 26

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ...................................................................................... 9

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................... 2

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...................................................................................... 16

*N.C. Fisheries Ass'n, Inc. v. Gutierrez*,
    518 F.Supp.2d 62 (D.D.C. 2007) ................................................................ 3

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) ................................................................ 21

*Natural Resources Defense Council v. Evans*,
    254 F.Supp.2d 434 (S.D.N.Y. 2003) ........................................................ 8

*Oceana, Inc. v. Raimondo*,
    2024 WL 3236723 (N.D. Cal. June 28, 2024) .......................................... 8

*Parravano v. Babbitt*,
    861 F.Supp.914 (N.D. Cal. 1994) ............................................................ 4

*Sierra Club v. U.S. EPA*,
    671 F.3d 955 (9th Cir. 2012) ................................................................ 20

## STATUTES

16 U.S.C. § 1802(10) ............................................................................ 13, 18

16 U.S.C. § 1853(a)(7) ...................................................................... 7, 13, 24

16 U.S.C. § 1855(b)(1)(A) ........................................................................ 7

16 U.S.C. § 1855(b)(1)(B) .................................................................. 7, 13

## REGULATIONS

50 C.F.R. § 600.805(a) ............................................................................ 21

50 C.F.R. § 600.815(a)(1)-(10) ............................................................ 23, 24

50 C.F.R. § 600.815(a)(2) ...................................................................... 7, 23

50 C.F.R. § 600.815(a)(2)(i) ............................................................ 6, 10, 18

50 C.F.R. § 600.815(a)(2)(ii) ........................................................ 6, 8, 10, 22

50 C.F.R. § 600.815(a)(6) ............................................................ 7, 10, 23, 24

50 C.F.R. § 600.815(a)(10) .......................................................... 6, 7, 22

# INTRODUCTION

The Service violated the MSA and APA when it failed to consider measures to protect designated EFH from the known destructive impacts of trawl fishing. The Service fails to justify using a population failure metric to assess habitat impacts or assessing adverse fishing effects to only half of designated EFH to meet its statutory obligations under the MSA. Its misplaced argument that scientists *could have* considered other factors does not save a process that allows the Service to conclude no adverse fishing effects based solely on two factors that do not comply with the MSA. The Service also arbitrarily failed to consider available information about adverse effects in its determination. Separately, the Service ignores its broader duty to conserve and enhance EFH as part of its five-year review, pointing to decades-old conservation measures. Finally, the Service fails to justify its limited consideration of alternatives under NEPA based on its unlawful and arbitrary adverse fishing effects determination.

# ARGUMENT

## I.     Oceana has standing.

The Service incorrectly states that Oceana lacks standing because its interests are not harmed by the agency's failure to act. Doc. 35 at 30-32. To the contrary, Oceana has a right to challenge the Service's actions and inactions because its interests are injured by the Service's failure to properly assess adverse fishing effects, its unlawful approval of EFH amendments that do nothing to fulfill its broader obligation to consider additional conservation and enhancement measures for designated EFH, and its failure to consider a

reasonable range of alternatives. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62

(1992) (discussing challenges to the legality of government action or inaction). Similar

to *American Oceans Campaign v. Daley*, the Service's actions and inactions have caused

actual or imminent injury to Oceana because EFH is not being properly protected from

ongoing trawl fishing activity the Service exclusively manages. 183 F.Supp.2d 1, 10

(D.D.C. 2000) (standing based on affiants' claim that "without better protections, the

EFHs will deteriorate, preventing them from enjoying their beauty…lead to very low fish

populations, preventing them from recreationally fishing"); *see also Flaherty v. Bryson*,

850 F.Supp.2d 38, 48-49 (D.D.C. 2012) (standing where plaintiffs claimed their ability to

harvest bass was harmed by the Service's failure to adopt adequate conservation

measures to protect fish upon which bass feed).

Here, Oceana's members have listed specific locations in the areas managed by

the Service where they fish, scuba dive, view marine life, and recreate that face

substantial risk of harm due to inadequate EFH protections. Doc. 31-1, ¶¶18-26, 29; Doc.

31-2, ¶¶1, 3-10; Doc. 31-3, ¶¶1, 4-5, 7. Continued trawling in EFH harms Oceana

members' interests in viewing healthy coral gardens, various marine life, and harvesting

fish and other species to feed their families. *See* Doc. 31-1, ¶¶30, 35-36; Doc. 31-2, ¶¶8,

11, 13-17; Doc. 31-3, ¶¶5-6, 8, 10; *see also Friends of the Earth, Inc. v. Laidlaw Env't

Servs., Inc.*, 528 U.S. 167, 183 (2000).

Contrary to the Service's assertion of attenuated harm, the injuries to Oceana's

and its members' interests are traceable to the Service's unlawful actions and inactions.

The Service argues those injuries are attenuated because "additional steps" would need to occur before Oceana is harmed.  Doc. 35 at 31.  But it is the Service's failure to take the steps required by the MSA that causes harm:  the Service's arbitrary analysis led it to adopt amendments that do not adequately protect EFH and instead allow harm to continue unmitigated, which increases the risk that marine habitat and wildlife Oceana's members and supporters use and enjoy will continue to be harmed by ongoing trawling activities.  *See N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F.Supp.2d 62, 83 (D.D.C. 2007) (finding causal connection between an FMP amendment that increased the probability that plaintiffs would catch less fish and endure potential economic harm).  Contrary to the Service's assertion, Doc. 35 at 31, Plaintiff's harms are not several steps removed like the plaintiffs in *Gulf Restoration Network, Inc. v. National Marine Fisheries Service*, who challenged an FMP alleging harm from aquaculture facilities that had yet to be permitted, constructed, or operated.  730 F.Supp.2d 157, 166-67 (D.D.C. 2010) (plaintiffs could not challenge FMP because it "merely construct[ed] a framework within which [the Service] may permit an entirely new activity that has yet to occur").  Here, because the EFH amendments do not comply with the MSA's mandates to protect EFH, ongoing fishing activities are allowed to continue at the same levels, in the same areas, and using the same gear.  NMFS00662 (citing no changes to fishery operations or fishing activity as a result of the EFH review).  Oceana's injuries are therefore traceable to the Service's failure to consider or adopt in the EFH amendments measures to restrict fishing activities to minimize adverse fishing effects on EFH.  *Am. Oceans Campaign*,

183 F.Supp.2d at 5, 9-10 (standing found for plaintiffs to challenge Council's failure to adopt measures to limit fishing activities).

Oceana's injuries are also likely to be redressed by a favorable decision. *Cf.* Doc. 35 at 32. Decreased opportunities to fish and view marine life are caused by the conditions the EFH review process is intended to address if rooted in a lawful analysis. An order directing the Service to abide by all its statutory obligations—properly assess adverse fishing effects as part of its EFH review, consider available evidence, and complete an EA or EIS that identifies measures to minimize adverse effects from trawling and other additional measures to encourage the conservation and enhancement of EFH—will likely redress Oceana's injuries. *See Parravano v. Babbitt*, 861 F.Supp. 914, 929 (N.D. Cal. 1994) (standing found based on claim of decreased fishing opportunities which a statute seeks to address, and an order directing defendant to implement measures to improve fish runs would likely redress their injury), *aff'd*, 70 F.3d 539 (9th Cir. 1995). Had the Service complied with the MSA and NEPA, it could have conclude that additional protective management of designated EFH is appropriate.

Further, the Secretary's approval of the arbitrary FMP amendments is subject to judicial review under the APA. Doc. 31 at 12.

## II. The Service has not justified its failure to meet its continuing obligation to consider minimization measures, and its broader obligation to consider conservation and enhancement measures.

### A. A five-year EFH review includes obligations to assess adverse fishing effects and consider conservation measures.

Before addressing the core deficiencies of the Service's process for evaluating adverse effects, a few obfuscating points raised in the responses deserve clarification. First, the Service and Intervenor-Defendants focus their responses on a straw man argument—that the Service is obligated to impose new conservation measures at every five-year review—which Oceana did not raise. Doc. 35 at 39; Doc. 34 at 26. Oceana instead argues the Service must lawfully assess adverse fishing effects on designated EFH and, if there is evidence that fishing adversely affects EFH beyond the low threshold established by Congress, it must consider establishing measures to minimize them. Doc. 31 at 35-36. In addition, Oceana argues that separate and apart from the obligation to minimize adverse fishing effects, the Service must assess whether it could take actions to meet its broader obligation to conserve and enhance EFH. *Id.* at 40-41. All of which the Service did not lawfully do.

Second, though the Service and Intervenor-Defendants appear to suggest in places that past actions[1] to protect EFH suffice to meet the Service's obligations or that review

---

[1] Contrary to the Service's and Intervenor-Defendants' suggestions, Doc. 35 at 39; Doc. 34 at 26-30, Oceana does not dispute that the Service has taken action in the past to protect EFH, albeit most of it many years ago. *See* EML01161-65; NMFS01002. The dispute here centers on its failure in *this five-year EFH review* to conduct a proper fishing effects analysis or consider EFH conservation and enhancement measures.

of adverse fishing effects and necessary additional conservation measures are not required in the five-year EFH review, *see* Doc. 35 at 39-40, neither is consistent with the law. The agency's own record reflects its awareness of its obligation to assess possible adverse fishing effects and conservation measures in its EFH reviews. MSA regulations make clear that the role of the EFH review includes both an adverse fishing effects analysis and consideration of possible conservation and enhancement measures. Specifically, one of the purposes of the EFH five-year review is for the Service to consider the most recent data on fishing impacts indicates such impacts are more than minimal and not temporary, and, if so, to consider measures to minimize those impacts. 50 C.F.R. § 600.815(a)(2)(ii). The Service is also required to assess whether past actions are effectively minimizing adverse fishing effects and consider whether new ones are warranted. *Id.* § 600.815(a)(2)(i). Contrary to the Service's suggestion, its obligation to "update EFH information", Doc. 35 at 16-17, 34 (summarizing role of EFH review), does not eliminate its obligation to assess fishing effects and consider conservation measures in its five-year review. Section 600.815(a)(10) incorporates every preceding provision of the subsection. It provides that a complete review of "all EFH information"—that is, the previously listed EFH components, including adverse fishing effects and additional conservation measures—should be conducted at least once every five years by reviewing new information relevant to each, and outlines some types of information that should be considered as part of the review. *See* 50 C.F.R. § 600.815(a)(10); *see also* COUN00018 (role of 2022 EFH review is to "broadly evaluate all EFH components" in FMPs).

Further, the structure of the MSA regulations underscores that the duty to evaluate and minimize adverse fishing effects is separate from the duty to identify conservation and enhancement measures. *See* 50 C.F.R. § 600.815(a)(2) ("[f]ishing activities that may adversely affect EFH"), 600.815(a)(6) ("[c]onservation and enhancement").

The regulations at section 600.815 implement the statutory requirements of the MSA charging the Service with minimizing adverse effects on EFH caused by fishing, and identifying other actions to encourage the conservation and enhancement of EFH. 16 U.S.C. § 1853(a)(7). Contrary to the Service's assertion that it need only update EFH "identifications" in its five-year reviews, Doc. 35 at 39-40 (citing 16 U.S.C. § 1855(b)(1)(A)), the statute is clear its duties do not end there. *See* 16 U.S.C. § 1855(b)(1)(A) (directs the Secretary to promulgate regulations to implement statutory duties); 50 C.F.R. § 600.815(a)(10) (complete review of all EFH information should occur every five years). The Service also fails to acknowledge its ongoing obligation under the statute, *see* Doc. 35 at 39-40, which requires it to provide recommendations regarding "the adverse impacts on [EFH], and the actions that should be considered to ensure the conservation and enhancement of [EFH]." 16 U.S.C. § 1855(b)(1)(B). Finally, as discussed below, *infra* pp. 10, 25, the record shows the Service recognized that its obligation in the five-year review is to assess anew potential adverse fishing effects (component 2), and if found, consider practicable measures to minimize them, and to consider other conservation measures for EFH (component 6).

The cases cited by the Service, Doc. 35 at 39, and Intervenor-Defendants, Doc. 34

at 28, are factually distinguishable. In *Natural Resources Defense Council v. Evans*, the court found the record supported the Council's conclusion there were no "identifiable" adverse fishing effects to tilefish EFH, 254 F.Supp.2d 434, 440-41 (S.D.N.Y. 2003), therefore it was reasonable not to impose new restrictions on bottom-tending mobile gear. *Id.* at 442.[2] In *American Oceans Campaign*, the court upheld EFH amendments approved by two councils because the record showed the Service had actually considered mitigation measures but rationally decided they were not needed. 183 F.Supp.2d at 7-8, 15-16. Likewise, in *Friends of Del Norte v. California Department of Transportation*, the court found the project proponent had considered measures to minimize adverse effects and incorporated them into the project and the Service reviewed the project proponent's proposal and concluded "no additional practical measures [] could be taken to minimize or avoid [the] effects." 2023 WL 2351649, at *11 (N.D. Cal. Mar. 3, 2023). In *Oceana, Inc. v. Raimondo,* 2024 WL 3236723, at *14-15 (N.D. Cal. June 28, 2024), the court found that the record showed the Service did consider effects on EFH and found they would be minimal because the directed sardine fishery was closed and predators could switch to other prey while sardine levels were low. None of the cases cited by the Service, Doc. 35 at 39, or Intervenor-Defendants, Doc. 34 at 28, therefore, support an argument that past actions are sufficient or that review of adverse effects or conservation

---

[2] The MSA regulations at issue in this case no longer include the provision that limited the agency's minimization obligation to "identifiable" effects. 50 C.F.R. § 600.815(a)(2)(ii); *see* Doc. 31 at 34-35 (explaining the evolution of the final EFH regulations).

measures is not required in a five-year review. Nor do any of the cases support the unlawful primary criteria the Service employed here to assess adverse effects.

Prior management actions do not absolve the Service of fulfilling its statutory and regulatory obligations to continue to assess, during every five-year EFH review, whether existing measures are enough to minimize the ongoing harms to EFH caused by trawl fishing, and, at a minimum, separately consider whether additional measures to more broadly conserve and enhance designated EFH are warranted. What was appropriate in the past may not be sufficient today to protect EFH, considering new information that confirms ongoing trawl fishing is harming benthic habitats and fragile seafloor despite the measures put in place in 2005. Doc. 31 at 18-20. Finally, the identification of conservation and enhancement measures is not dependent on conclusions from the adverse fishing effects assessment. *Supra* p. 6. The record shows the Service improperly hinged its consideration of proposed actions for either obligation on the outcome of its arbitrary fishing effects analysis. *Infra* pp. 10, 25. Any suggestion in the government's brief that the Service lacks the obligation in its five-year EFH reviews to consider adverse fishing effects and conservation measures, Doc. 35 at 46, conflicts with the statute and regulations and, even if it were the agency's interpretation, warrants no deference. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024) ("[c]ourts must exercise their independent judgement in deciding whether an agency has acted within its statutory authority").

Intervenor-Defendants' suggestion that the Service reviewed past conservation

actions and decided they were sufficient, Doc. 34 at 29-30, fails because they are unable to point to any document in the record that contains any such analysis. *See* 50 C.F.R. § 600.815(a)(2)(i) (FMPs must describe benefits of past management actions); *id.* § 600.815(a)(2)(ii) (rationale for relying on past measures should be provided). To the contrary, the Council's rationale for not proposing any adverse fishing effects minimization measures was that "[n]one of the Fishing Effects evaluations concluded that fishing effects were more than minimal and temporary." COUN05303; *see also* NMFS00793-95 (stating the "Council may wish to identify additional recommendations to minimize effects from fishing" and listing existing conservation measures). There was no rationale at all cited for failing to propose additional, broader conservation and enhancement measures under component 6. COUN05302-03; *see* 50 C.F.R. § 600.815(a)(6).

## B.     The two primary factors the Service uses to determine adverse effects are unlawful.

With these basic obligations clarified, we turn to the responses to Oceana's fundamental argument—the adverse fishing effects conclusion is arbitrary because it rests on a process that relies on two main criteria: one that is unlawful because it finds adverse effects only when they are extreme, and one that is unlawful because it conflicts with the statutory command to minimize adverse effects to *all* designated EFH. Neither the Service nor Intervenor-Defendants rebut Oceana's argument that the structure and legislative history of the MSA and its implementing regulations set a low threshold to

trigger minimization measures. *See* Doc. 31 at 33-36; Doc. 35 at 34-39; Doc. 34 at 20-26. Yet its process allows the Service to rely only on two factors, neither of which meet the low and precautionary threshold established by Congress. Both metrics only catch some impacts to EFH—those that are severe enough to cause a population to collapse, and those to half of designated EFH the agency believes is most used by species during the adult life stage. The Service does not offer any substantial defense to either threshold, relying mostly on the discretion it retains to consider other factors. However, this discretion, which the Service does not demonstrate is typically used, is not sufficient to save a process that concludes "no adverse effects" based solely on unlawful factors.

1. **The use of MSST fails to meet the legal standard required by the MSA.**

The Service's use of MSST as one of the two factors sufficient to support a no adverse effects conclusion is inconsistent with the plain reading of the MSA and governing regulations, which set a low threshold for the determination of adverse effects. *See* Doc. 31 at 33-37. The purpose of MSST is to assess whether a stock is overfished, *see* Doc. 31 at 37 (describing statutory construction of MSST-related provisions in the MSA), not to be used as a primary indicator assessing habitat damage. Notably, the Service and Intervenor-Defendants do not refute Oceana's assessment that the MSA views MSST and the protection of EFH as two different things. *Id.* at 37-39 (describing and comparing statutory construction which explicitly distinguishes between overfishing and habitat protection).

Oceana does not dispute that habitat effects are one of many factors that may influence a stock's abundance. *See* Doc. 35 at 36 (Service asserting MSST provides link between population status and EFH); EML04027 ("habitat effects are only one of many factors that influence the stock abundance"). The Service, however, cannot rationally justify its reliance on MSST as a primary indicator in its habitat disturbance analysis because the use of MSST effectively raises the threshold to trigger potential agency action, beyond Congress' intent. Doc. 31 at 35-39. While Oceana does not dispute "it is completely appropriate" to evaluate whether fishing is affecting EFH when a species falls below its MSST, Doc. 35 at 36, the Service cannot allow adverse fishing effects to continue unabated until a stock reaches the point of being deemed overfished. Yet that is the result of using MSST as a primary indicator of fishing effects as the agency does here.

MSST remains an important factor in the adverse fishing effects analysis. NMFS01628 (in 2005, MSST was the primary consideration to evaluate fishing effects); COUN14267 (in 2023 EFH review, MSST is the first threshold question for fishing effects assessment). Contrary to Intervenor-Defendants' suggestion, Doc. 34 at 20-21, nothing in the record resolves the 20 years of criticisms directed at the use of MSST. In 2005, reviewers did not assume that MSST was the only metric used to assess impacts to habitat, Doc. 34 at 21; they evaluated multiple factors including MSST and concluded MSST is inappropriate. COUN14256 (CIE evaluated the fishing effects model and the general approach employed to evaluate adverse fishing effects on EFH); EML04056-57

(information reviewed by panel). Further, the criticisms were not just of "three individuals," Doc. 34 at 21, but were broadly shared by the entire six-person independent peer review panel. *See* EML04030 (members of review panel); EML04048 ("The panel felt [MSST] is not an appropriate [criterion] because it is largely insensitive to habitat changes"). The record demonstrates the Service has received suggestions for better suited metrics to analyze habitat impacts, but still opts to rely on MSST. *See, e.g.*, SUPP00641 ("replace MSST criterion with consideration of fishery impact on the EFH itself as the primary criterion"); *see also* EML00977-80 (Oceana comment to improve fishing effects model by using accurate estimates of recovery rates and examining the full extent of EFH); SUPP00412-13 (coral bycatch data can assess fishing effort and habitat impacts).

### 2. Congress did not give the Service discretion to assess impacts to only some of the EFH it has designated.

The Service does not justify its use of the other primary criterion in its analysis—an assessment of habitat disturbance to a portion of the species' "core" area. This is the portion of designated EFH the Service believes is most used by adult species. However, the Service's decision to apply its adverse fishing effects assessment to only half of the identified EFH violates the MSA's statutory mandate to assess impacts on *all* of the EFH it designates, for *all* life stages. *See* 16 U.S.C. § 1853(a)(7) (assess adverse effects on the EFH it has identified); *id.* § 1802(10) (EFH includes habitat necessary for spawning, breeding, feeding, or growth to maturity); *id.* § 1855(b)(1)(B) (provide recommendations

to the Council regarding adverse impacts on the EFH it has identified and actions to consider to ensure its conservation and enhancement).

Rather than analyzing effects on all habitat it has designated as "essential," the Service only assessed fishing impacts to *half* of its designated EFH, where species at the adult life stage are most concentrated. NMFS00687 (the upper 50th percentile core EFH area from the EFH maps for adults or combined life stages); NMFS05723-24 (example of combined life stage information used for Spiny dogfish due to data limitation concerns). In other words, the Service did not assess whether fishing was affecting the other half of designated EFH, and virtually ignored all areas it deemed essential for subadults, juvenile, and larvae.

Contrary to Intervenor-Defendants' arguments, only assessing adverse fishing impacts to half of the habitat used by adults does not lower the threshold for impacts, because trawl fishing occurring outside the "core" area is ignored. Doc. 34 at 24-25 & n.102. Nor does it "statistically minimize[e]" habitat reduction, as argued by the Service. Doc. 35 at 37. That is merely an artifact of the Service's decision to use a 10 percent threshold. The Service can use a lower percentage if it considers the whole of EFH, or, more consistently with the statute, move to an evaluation of practicable minimization measures if any designated EFH is adversely affected. The Service's justification for deciding it need only assess impacts to 50 percent of the area occupied by adult species, *id.* at 37-38, is arbitrary because the MSA unequivocally directs fishing effects be assessed for all EFH, not some portion of it.

### 3. The discretion to consider other information does not rescue the process.

In defense of its use of MSST and "core" area, the Service asserts the discretion it retains to consider other factors makes its process lawful. Doc. 35 at 34-35, 39. However, consideration of other factors is not required by the Service's process, and the Service makes no argument that additional factors are considered in the majority of cases. Instead, it cites to one example, *id*. 35 at 38 (EBS Kamchatka flounder), where a stock did not exceed the 10 percent of "core" area or MSST thresholds, and the stock author chose to consider other factors. NMFS05685. The other examples cited by the Service relate to instances when stocks were either below MSST or exceeded the 10 percent threshold. Doc. 35 at 36 (two stocks below MSST received additional analysis); *id.* at 38 (16 species that exceeded 10 percent disturbance level received additional analysis). This hardly demonstrates that the Service consistently exercises its discretion to consider other factors in its fishing effects analysis when it is not required to. *See* COUN19220 (two examples included to demonstrate fishing effects method, but "neither of these examples would normally go through the entire exercise" being that less than 10 percent of the "core" area was impacted). Thus, the discretion nominally afforded to consider other factors cannot save the arbitrary process the Service has created which allows it to rely solely on two inappropriate factors when assessing adverse fishing effects—neither of which meet the demanding standard of the MSA.

The Service's fishing effects analysis is incomplete and significantly underrepresents the effects of destructive fishing practices on EFH. The Service used an

unlawful metric and limited its analysis to only a portion of EFH. Even for the effects it did consider, it ignored available evidence in the record about life stages of managed species, as well as recovery times and depths of sensitive habitat features that are components of EFH (*e.g.*, corals and sponges). Any one of those errors would be enough to find the Service's decision arbitrary. However, the combination shows serious disregard for statutory requirements and undermines the Service's conclusion that no Council-managed fishing activities have more than minimal and temporary adverse effects on EFH.

### C. The Service's fishing effects decision is arbitrary because it ignored available evidence.

Separate and apart from its unlawful process to assess fishing effects, the Service's fishing effects analysis is also arbitrary because it ignored relevant record evidence in making its determination. Specifically, it disregarded record evidence of recovery times for long-lived benthic habitat features, *see, e.g.*, NMFS01070-71; SUPP00384; NMFS00951; NMFS08558, especially in shallow waters less than 300 meters deep, *see, e.g.*, SUPP00361-66; SUPP00386; NMFS01070-71; SUPP00388, and failed to assess habitat impacts to EFH important to all species' life stages. *Infra* pp. 19-20. The Service cannot articulate a rational connection between the facts in the record and the decision it made. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). Here, the record plainly demonstrates the Service made a "clear error in judgment," *id.* (citation omitted), by disregarding available evidence in its fishing

effects assessment, which caused it to fall short of its obligations under the MSA and its implementing regulations.

Instead of addressing Oceana's argument that the Service failed to fulfill its statutory obligation to assess adverse fishing impacts to the EFH it has designated for all life stages and ignored available evidence in this process, Doc. 31 at 42, Intervenor-Defendants quarrel with an argument Oceana has not made that the Service "disregarded information about subadult and juvenile fish life stages in *designating* EFH." Doc. 34 at 33 (emphasis added). Oceana does not dispute this information was considered in *designating* EFH; the failure Oceana asserts is this information was not considered in *assessing* adverse effects to designated EFH.[3]

> ### 1. The Service failed to consider available evidence showing benthic habitat features are long-lived and exist at shallow depths.

Despite acknowledging that corals and sponges are EFH for numerous species, *see, e.g.*, NMFS00306; COUN21188-89 (Gulf of Alaska FMP stating that EFH for settled early juvenile, subadults, and adult yelloweye rockfish includes "areas of vertical relief, such as…coral, and larger sponges"), the Service argues it is under no obligation to consider long-lived habitat features in its EFH reviews or do so in any particular way.

---

[3] It is true, that Oceana commended the Service in 2017 for designating EFH. *See* Doc. 35 at 11, 21, 34; COUN19084. However, throughout the 2023 EFH review, Oceana has consistently maintained its concerns with the fishing effects analysis, the Service's disregard of evidence for long-lived habitat features at shallow depths, and the failure to assess impacts to EFH for juvenile and sub-adult species. *See* Doc. 31 at 26-27.

Doc. 35 at 42.  To the contrary, benthic habitat features like corals and sponges are part of designated EFH, and adverse fishing effects must be assessed for each type of habitat found within EFH.  16 U.S.C. § 1802(10) (definition of EFH); 50 C.F.R. § 600.815(a)(2)(i) (FMP must evaluate potential adverse fishing effects on each type of habitat found within EFH).

The Service has long acknowledged that the recovery rates of structure-forming organisms like corals and sponges are "very influential in estimating fishing effects." NMFS01229.  Though in 2005, the Service asserted recovery rates were "not well known."  *Id.*  The record demonstrates, to the contrary, that there is substantial current information documenting recovery rates of more than 100 years for these habitat features. *See, e.g.*, EML00978-79; SUPP00207-08; SUPP00057-59; NMFS11139-43; NMFS01070-71; SUPP00384; NMFS00951; NMFS08558.  The Service was made aware of published studies as early as 2002 that trawling damages marine flora and fauna, SUPP00468, and some corals require centuries to recover.  SUPP00475-76.  The Service's decision to use a 50-year recovery rate in its fishing effects model, NMFS05561, was arbitrary because it ignores available evidence.

The Service has also acknowledged that many species are associated with habitat-forming invertebrates at depths less than 300 meters.  NMFS08475; COUN21280-83 (for example, other Rockfish Complex at the adult, subadult, settled early juvenile, and larvae life stages found at depths of 1 to 200 meters and associated with anemones, soft corals, and sponges); COUN20506.  Oceana submitted numerous comments citing published

studies documenting the existence of corals and sponges at shallow depths that are subject to damage from trawling. NMFS11139-43; EML00979-80; EML03913-15; EML06885; SUPP00208-09; EML07368 (study validating coral and sponge distribution models based on including sampling stations at depths of 20 to 200 meters). Yet the Service did not consider this evidence. And just because the Service added a new habitat category, *see* Doc. 35 at 42-43, its assessment is not "precautionary" if it failed to consider the available evidence showing vulnerable long-lived habitat features at depths less than 300 meters. The Service cannot use arguments of agency deference to defend its failure to consider available evidence. *See id.* at 43. The choice to ignore evidence is not rooted in the agency's technical expertise, it is plainly a failure to consider an important aspect of the problem and the Service's "explanation [] runs counter to the evidence before the agency." *Env't Def. Ctr. v. BOEM*, 36 F.4th 850, 871 (9th Cir. 2022) (citation omitted).

### 2. The Service failed to assess adverse effects to the habitat species of all life stages use.

Contrary to the Service's assertion, Doc. 35 at 41, the fishing effects model does not capture all life stages because it only assessed fishing impacts to the habitat used by *adult* species or combined life stages when not enough data for adults was available. NMFS05574-79 (tables 3 to 5 showing the Service looked at the fishing effects almost exclusively on "adult" groundfish, with only a few exceptions where they looked at "all" life stages); NMFS05723-24 (due to data limitations, analysts combined subadult and

adult life stages to assess habitat impacts for Spiny dogfish). That the analysis is done at a population level, as the Service asserts, is immaterial if the analysis is done for adults only (or for combined life stages only when adult habitat is unknown). For example, there is EFH information available for subadult, juvenile, larvae, and egg for Alaska plaice, Arrowtooth flounder, Atka mackerel, and countless other species. NMFS00663-65 (listing levels of EFH information by life stage for species in the Bering Sea and Aleutian Islands); *see also* NMFS00672-74 (listing levels of EFH information by life stage for species in the Gulf of Alaska). Nevertheless, the Service only assessed fishing impacts for habitat used by adults. NMFS05574-40 (listing habitat disturbance percentages for over 85 different adult species and adult species complexes). Contrary to Intervenor-Defendants' assertion that Oceana cites the SSC's comments out of context, Doc. 34 at 33, the SSC specifically flagged that it had identified there was a "mismatch between the multiple life stages for which EFH has been *defined* and the evaluation of fishing effects for only adult life stages." COUN03445 (emphasis added). The Service's decision to disregard available life stage data in its fishing effects analysis was arbitrary, because the MSA requires it evaluate adverse fishing effects to the EFH it has designated. *See Sierra Club v. U.S. EPA*, 671 F.3d 955, 968 (9th Cir. 2012) (agency action arbitrary and capricious when it relied on old data and provided no meaningful comment on significance of new data).

**III.    The Service arbitrarily failed to consider a reasonable range of alternatives in violation of NEPA and the APA.**

The Service and Intervenor-Defendants assert incorrectly that Oceana's proposal is beyond the action's stated purpose and need.  The purpose and need statement, however, reflects a broad purpose to comply with the EFH final rule, including its conservation and enhancement provisions and requirements to minimize adverse fishing effects.  Oceana's proposal falls squarely within that purpose.  Further, the Service's unlawful and arbitrary conclusion of no adverse effects does not justify its failure to consider additional conservation and enhancement measures, including Oceana's proposal—or any similar proposal.

**A.    Oceana's proposal is consistent with the Service's stated purpose and need.**

The Service inappropriately advances a circumscribed reading of its purpose and need for the action.  Doc. 35 at 43-47.  Courts look first to the purpose and need statement to determine whether an agency considered a reasonable range of alternatives. *E.g.*, *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246-47 (9th Cir. 2005).  In evaluating the sufficiency of the stated purpose and need, courts examine whether they are consistent with relevant statutory obligations.  *E.g.*, *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 2025 WL 1669344, at *8 (9th Cir. June 13, 2025) (finding as a preliminary matter that the purpose and need was consistent with the statute).  Here, the Service's stated purpose is to comply with the EFH final rule. NMFS00652; *see also* 50 C.F.R. § 600.805(a) (purpose of final rule includes identifying

EFH, minimizing adverse effects, and actions to conserve and enhance EFH). As the EA acknowledges, including in its purpose and need statement, the final rule includes review of all EFH components every five years. *E.g.*, NMFS00652; *see also* 50 C.F.R. § 600.815(a)(10). The final rule also includes a requirement to amend FMPs as warranted based on the review of available information. 50 C.F.R. § 600.815(a)(10); NMFS00652.

The Service incorrectly asserts that later clauses in the purpose and need statement narrow its meaning. Doc. 35 at 45. To the contrary, the statement's text regarding amendment of FMPs "as warranted," NMFS00652, attempts to restate a portion of the EFH final rule and is consistent with compliance with the EFH final rule and the MSA. The Service has a continuing obligation to conserve and enhance EFH, including by adopting minimization measures for adverse fishing effects to the extent "practicable." 50 C.F.R. § 600.815(a)(2)(ii); Doc. 31 at 10, 33-36, 40-42, 47. Revising and amending FMPs as warranted is consistent with these two requirements of the MSA and Oceana has not suggested otherwise. This is also consistent with the agency's discussion throughout the EA. NMFS00644, 00648, 00650. Neither does the third sentence in the statement, discussing available information, limit the purpose and need statement to something narrower than to comply with the EFH final rule. *See* NMFS00652.

Accordingly, Oceana's proposal falls well within the stated purpose and need for

the action.[4]  It advances the stated purpose and need to comply with the EFH final rule, which contains 10 components, including the obligation to assess fishing effects and identify additional conservation and enhancement measures.  Doc. 31 at 47.  Oceana's proposal is therefore reasonable.  *See Ctr. for Biological Diversity*, 2025 WL 1669344, at *9 (citing *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023)).  Notably, Oceana's proposal would maintain the vast majority of current fishing at recent levels while protecting significantly more EFH.  Doc. 31 at 27-28, 46.  While Intervenor-Defendants suggest that Oceana's proposal may not be appropriate in the Gulf of Alaska, they cite no evidence to contradict the fact that Oceana's proposal would protect significantly more EFH—and the species that rely on it.  *See* Doc. 34 at 42.  Closing new areas to bottom trawling, as Oceana proposed, is something the Service has adopted in other areas of the North Pacific and there is no dispute that the Service may do so here. *See, e.g.,* Doc. 35 at 27-28, 46.

Intervenor-Defendants incorrectly argue that Oceana's proposal focused solely on a single EFH component.  *See* Doc. 34 at 40-41.  Oceana's proposal, however, addressed both conservation and enhancement (component 6) and fishing activities that could adversely affect EFH (component 2).  Doc. 31 at 27-28; 50 C.F.R. § 600.815(a)(2), (6). Moreover, the proposed alternative would minimize adverse fishing effects only to the

---

[4] Even if the stated purpose could be read to apply only to the five-year review, there is no dispute the Service must still examine all components, including (1) the requirement to minimize adverse effects to EFH and (2) identify actions to conserve and enhance EFH.  *See* 50 C.F.R. § 600.815(a)(1)-(10); Doc. 35 at 45-46; Doc. 34 at 41.

extent practicable by being structured to minimize effects on the existing fisheries. Doc. 31 at 27-28; *contra* Doc. 34 at 40-41. More importantly, there is no dispute that the Service did not consider Oceana's proposal or any other proposal that includes similar measures. Doc. 31 at 47-48; Doc. 34 at 37, 40-42; Doc. 35 at 47-50.

**B.      The Service's exclusion of Oceana's proposal was arbitrary.**

The Service asserts that the Service appropriately narrowed its review to a subset of EFH components. Doc. 35 at 46, 48. This argument, however, ignores the law—EFH regulations require agency review of all EFH components, including conservation and enhancement. *Supra* pp. 6-7; 50 C.F.R. § 600.815(a)(1)-(10). Even without a finding of adverse effects, there is no dispute that MSA places on the Service an ongoing obligation to conserve and enhance EFH. *Supra* pp. 6-7; Doc. 31 at 40-41; Doc. 35 at 46. In other words, the Service's exclusion of Oceana's proposal because it is a conservation and enhancement measure is premised on the agency misreading the MSA's requirements. *See* 16 U.S.C. § 1853(a)(7); 50 C.F.R. § 600.815(a)(6). Additionally, Oceana's proposal, whether viewed as a conservation and enhancement measure or a fishing effects minimization measure, is well within the purpose and need. *Supra* pp. 21-24.

To the extent the agency excluded Oceana's proposal as a result of its prior adverse effects finding, that decision rests on an arbitrary premise. Specifically, in response to a comment that it needed to analyze a reasonable range of alternatives, the Service stated that it "followed the Council's roadmap." FR00003. The Service now suggests that the agency excluded Oceana's proposal from consideration based on the

agency's finding that fishing effects were minimal. *See* Doc. 35 at 49-50 (from EFH review, no additional conservation and enhancement measures warranted). As demonstrated above, however, that finding was unlawful and arbitrary. *Supra* pp. 10-20. Additionally, the record shows the Council's process encompassed consideration of conservation and enhancement measures, including actions to minimize fishing effects, once the fishing effects analysis had been completed. *See* NMFS00725 ("Council may wish to identify additional recommendations to minimize effects from fishing based on the FE evaluation"); *see also* NMFS00793; *see also* COUN05964 (February 2024 report noting upcoming presentation on trawl seafloor impacts to evaluate whether additional management actions are needed). Accordingly, the adverse effects finding cannot serve as a basis to exclude consideration of Oceana's proposal. The Service's exclusion of Oceana's proposal is therefore arbitrary.

## C.      The Service's and Intervenor-Defendants' other arguments concerning alternatives lack merit.

The Service misleadingly implies Oceana's proposal was not timely or appropriately offered. Doc. 35 at 25-26. To the contrary, Oceana suggested the Council freeze the trawl footprint as early as January 2022. COUN00454; Doc. 31 at 27-28. In January 2023, the Council declined to initiate a call for proposals to conserve and enhance EFH, COUN13825, but later indicated that fishery management proposals could be submitted under staff tasking, which Oceana did in June 2023. COUN05158 n.2 (citing Council February 2023 newsletter); COUN05158-204. Oceana's specific

proposal was offered long before the final EA was published in December 2023, and the FMP amendments were published in July 2024. This allowed the Service ample time to consider Oceana's proposal to freeze the trawl footprint. *See, e.g.*, *Hualapai Indian Tribe v. Haaland*, 755 F.Supp.3d 1165, 1193-94 (D. Ariz. 2024) (tribe's proposed alternative submitted several months before final EA supported likelihood of prevailing on alternatives claim).

The Service's assertion that Oceana agrees with the narrow interpretation of its purpose and need is wrong. Doc. 35 at 46. Far from agreement, the Service points to a portion of Oceana's brief that critiques the agency's later construction of the stated purpose and need. Doc. 31 at 47-48.

The Service also unhelpfully misconstrues Oceana's characterization of alternatives. Doc. 35 at 47-48. Oceana explained that the record reflected that both the alternatives examined by the Service, and their impacts, are similar. Doc. 31 at 28-29, 45-46. Regardless, courts have viewed the similarity in alternatives and in impacts as supporting a failure to consider an adequate range of alternatives. *E.g.*, *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1218 (9th Cir. 2008) (alternatives range and impact range were both narrow).

## CONCLUSION

For the foregoing reasons, Oceana respectfully requests the Court remand to the Service the decision adopting the EFH amendments and the supporting EA for completion of new EFH amendments and a new EA or EIS that comply with the law.

Respectfully submitted this 18th day of July, 2025.

*s/ Charisse Arce*
Charisse Arce (Alaska Bar No. 2303017)
Maile Tavepholjalern (Alaska Bar No. 1611094)
EARTHJUSTICE

Katharine S. Glover (Alaska Bar No. 0606033)
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE

Andrea A. Treece (California Bar No. 237639)
(*pro hac vice*)
EARTHJUSTICE

*Attorneys for Plaintiff Oceana, Inc.*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITS**

I certify that this document contains 6,758 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits set in Court's text order granting Plaintiff's unopposed motion to file overlength reply, Doc. 37.

Dated:  July 18, 2025.

_s/ Charisse Arce_
Charisse Arce

**CERTIFICATE OF SERVICE**

I hereby certify that on July 18, 2025, a copy of the foregoing PLAINTIFF'S REPLY BRIEF UNDER LOCAL CIVIL RULE 16.3(c)(3) was served electronically on all counsel of record through the Court's CM/ECF system.

_s/ Charisse Arce_
Charisse Arce