# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

OCEANA, INC.,

        Plaintiff,

   v.

NATIONAL MARINE FISHERIES
SERVICE, *et al.*,

        Defendants,

  and

AT-SEA PROCESSORS
ASSOCIATION, *et al.*,

        Intervenor-Defendants.

Case No. 3:24-cv-00180-SLG

## DECISION AND ORDER

Plaintiff in this case is Oceana, Inc. ("Oceana"), "a non-profit international advocacy organization dedicated to protecting and restoring the world's oceans through policy, advocacy, science, law, and public education" with over 1.5 million members.[1] Oceana challenges non-regulatory amendments that Federal Defendants made to five Fishery Management Plans ("FMP") regarding essential fish habitat ("EFH").[2] The National Marine Fisheries Service ("NMFS") conducted

---

[1] Docket 16 at ¶ 5.

[2] Federal Defendants are the National Marine Fisheries Service; the U.S. Department of Commerce; Howard W. Lutnick, in his official capacity as Secretary of the U.S. Department of Commerce; and Samuel D. Rauch, III, in his official capacity as Deputy Assistant Administrator

a periodic review of EFH pursuant to the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or "MSA").[3] Oceana contends that the review and resulting FMP amendments violate the MSA, the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"), and seeks an order remanding the FMP amendments to NMFS to "correct the identified violations."[4] For the reasons set forth below, Oceana's request for relief is DENIED and its claims are DISMISSED.

## BACKGROUND

### I. Magnuson-Stevens Act

The MSA sets forth a national framework for the conservation and management of fishery resources within federal jurisdiction.[5] To that end, the MSA established eight Regional Fishery Management Councils, which prepare FMPs and plan amendments, and propose implementing regulations.[6] The North Pacific Fishery Management Council ("Council") is the regional council that has "authority over the fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska."[7] Although the Secretary of Commerce is responsible for reviewing and

---

for Regulatory Programs, NMFS. Docket 16 at ¶¶ 9-12.

[3] *See* 16 U.S.C. §§ 1801–1891d.

[4] Docket 31 at 10-11, 49.

[5] 16 U.S.C. §§ 1801(a)(6), 1811(a).

[6] *Id.* §§ 1852(a), (h), 1853(c).

[7] *Id.* § 1852(a)(1)(G).

implementing FMPs, the Secretary has delegated that authority to the National Marine Fisheries Service ("NMFS").[8]

The MSA directs each Regional Fishery Management Council to prepare and submit an FMP for each fishery under its authority that requires conservation and management.[9] Among other requirements, an FMP must "describe and identify essential fish habitat for the fishery based on the guidelines established by the Secretary under [16 U.S.C. § 1855(b)(1)(A)], minimize to the extent practicable adverse effects on such habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat."[10] The MSA defines "essential fish habitat" as the "waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity," and broadly defines "fish" to include "finfish, mollusks, crustaceans, and all other forms of marine animal and plant life other than marine mammals, and birds."[11]

Section 1855(b)(1)(A) directs the Secretary to establish regulatory guidelines to assist the Councils in describing and identifying EFH and in identifying actions to encourage conservation and enhancement of such habitat.[12]

---

[8] *Id.* § 1802(39); *id.* § 1854 (outlining the Secretary's responsibilities and authority); *see also Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 889 (9th Cir. 2010) (discussing the Secretary's delegation of authority to NMFS).

[9] 16 U.S.C. § 1852(h)(1).

[10] *Id.* § 1853(a)(7).

[11] *Id.* § 1802(11), (12).

[12] *Id.* § 1855(b)(1)(A).

The Secretary must also "set forth a schedule for the amendment of fishery management plans to include the identification of essential fish habitat and for the review and updating of such identifications based on new scientific evidence or other relevant information."[13]

Pursuant to § 1855(b)(1)(A), the Secretary issued EFH Guidelines in 2002.[14] Component 1 of the EFH Guidelines requires that each FMP describe and identify EFH as "habitats or habitat types determined to be EFH for each life stage of the managed species."[15]

Component 2 requires that an FMP also evaluate "the potential adverse effects of fishing on EFH."[16] "Adverse effects" are "any impact that reduces quality and/or quantity of EFH."[17] The adverse effects "evaluation should consider the effects of each fishing activity on each type of habitat found within EFH."[18] Further, "[t]he evaluation should list any past management actions that minimize potential adverse effects on EFH and describe the benefits of those actions to EFH. . . . In completing this evaluation, Councils should use the best scientific information

---

[13] *Id.*

[14] Magnuson-Stevens Act Provisions; Essential Fish Habitat (EFH), 67 Fed. Reg. 2343, 2375 (Jan. 17, 2002) (codified at 50 C.F.R. pt. 600).

[15] 50 C.F.R. § 600.815(a)(1)(i).

[16] *Id.* § 600.815(a)(2)(i).

[17] *Id.* § 600.810(a).

[18] *Id.* § 600.815(a)(2)(i).

Case No. 3:24-cv-00180-SLG, *Oceana, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 4 of 37

available, as well as other appropriate information sources."[19]  "Each FMP must minimize to the extent practicable adverse effects from fishing on EFH," and "Councils must act to prevent, mitigate, or minimize any adverse effects from fishing, to the extent practicable, if there is evidence that a fishing activity adversely affects EFH in a manner that is more than minimal and not temporary in nature."[20]

The EFH Guidelines also require that FMPs examine additional impacts on EFH: Component 3 requires that each FMP "identify any fishing activities that are not managed under the Magnuson–Stevens Act that may adversely affect EFH"; Component 4 requires that each FMP "identify activities other than fishing that may adversely affect EFH. . . . [and] describe known and potential adverse effects to EFH"; and Component 5 requires that each FMP, "[t]o the extent feasible and practicable, . . . analyze how the cumulative impacts of fishing and non-fishing activities influence the function of EFH on an ecosystem or watershed scale."[21]

Component 6 requires that each FMP "identify actions to encourage the conservation and enhancement of EFH, including recommended options to avoid, minimize, or compensate for the adverse effects identified [from non-MSA activities, non-fishing activities, and cumulative impacts], especially in habitat

---

[19] *Id.*

[20] *Id.* § 600.815(a)(2)(ii).

[21] *Id.* § 600.815(a)(3)-(5).

Case No. 3:24-cv-00180-SLG, *Oceana, Inc. v. Nat'l Marine Fisheries Serv., et al*.
Decision and Order
Page 5 of 37

areas of particular concern" ("HAPC").[22]   In the final rule adopting the EFH

Guidelines, NMFS explained a change from the interim final rule:

> To more accurately reflect the statutory language, the text states that "FMPs must identify actions to encourage the conservation and enhancement of EFH, including recommended options to avoid, minimize, or compensate for" adverse effects. The paragraph omits "and promote the conservation and enhancement of EFH" to better reflect the Councils' role as outlined in the EFH provisions of the Magnuson-Stevens Act.[23]

> Component 10 requires Councils to

> periodically review the EFH provisions of FMPs and revise or amend EFH provisions as warranted based on available information.  FMPs should outline the procedures the Council will follow to review and update EFH information. The review of information should include, but not be limited to, evaluating published scientific literature and unpublished scientific reports; soliciting information from interested parties; and searching for previously unavailable or inaccessible data. . . . A complete review of all EFH information should be conducted as recommended by the Secretary, but at least once every 5 years.[24]

In 2002, to comply with the MSA's requirements regarding EFH, NMFS

developed the long-term effects index ("LEI") to assess whether fishing effects

were more than minimal and not temporary.[25]   NMFS sought an outside peer

---

[22] *Id.* § 600.815(a)(6); *see also* Magnuson-Stevens Act Provisions; Essential Fish Habitat (EFH), 67 Fed. Reg. at 2344 (explaining that "Councils should identify EFH that is especially important ecologically or particularly vulnerable to degradation as 'habitat areas of particular concern' (HAPC) to help provide additional focus for conservation efforts").

[23] Magnuson-Stevens Act Provisions; Essential Fish Habitat (EFH), 67 Fed. Reg. at 2371.

[24] 50 C.F.R. § 600.815(a)(10).

[25] COUN19283.

review of the LEI in 2004.[26]  The independent review determined that the model was "reasonable," but identified several shortcomings, including that the index's "use of stock abundance relative to the Minimum Stock Size Threshold (MSST) to assess possible influence of habitat degradation on the productivity of fish stocks" was "inappropriate" because "MSST is not a sufficiently responsive indicator and provides no spatial information about areas with potential adverse effects."[27]  The reviewer also concluded that the use of MSST might obscure the effects of habitat destruction and that the LEI model did not give proper consideration to localized habitats, which was of particular concern for corals and sponges considering their long recovery times.[28]  The reviewer recommended improving the qualitative assessment of fishing effects by estimating "the rate of destruction of hard corals and sponges from the groundfish survey data."[29]

"NMFS scientists agreed that only considering stock abundance relative to MSST [did] not provide a sufficiently detailed analysis of the influence of habitat degradation on the productivity of fish stocks" and "noted that the evaluations of habitat effects were not limited to an assessment of stock status relative to MSST,

---

[26] COUN19283; SUPP00575-91.

[27] SUPP00575; COUN19283.  MSST is defined by federal regulation as "the level of biomass below which the capacity of the stock or stock complex to produce [maximum sustainable yield] on a continuing basis has been jeopardized."  50 C.F.R. § 600.310(e)(2)(i)(F).

[28] SUPP00584-85.

[29] SUPP00575-76.

but considered a full set of more detailed information on stock status, although those were not thoroughly described and incorporated into the materials provided to the [independent] reviewers."[30]

In 2005, NMFS used the LEI in its EFH Environmental Impact Study ("EIS") and Record of Decision for Alaskan federal waters that set out how and whether to amend the FMPs within the Council's jurisdiction pursuant to the MSA and the EFH Guidelines.[31]  As relevant here, the EIS described the potential adverse effects of fishing on EFH, which included an assessment of all FMP fisheries and then a "detailed evaluation of those groundfish fisheries that appeared to have potential for more than negligible effects on habitat."[32]  The analysis "indicated that groundfish fisheries (trawl fisheries, in particular) had some measurable effect on benthic habitat, whereas the scallop, crab, and salmon fisheries (especially) had almost no measurable impacts, primarily due to the small footprints of these fisheries relative to available habitats."[33]  Accordingly, NMFS determined that the adverse effects on EFH from the scallop fishery, the Bering Sea and Aleutian Islands crab fisheries, and the salmon fisheries were all either minimal and/or

---

[30] COUN19284.

[31] NMFS00841; NMFS00854.

[32] NMFS00988.  The evaluation was included as Appendix B to the EIS; Appendix B is not in the administrative record.  NMFS00988.

[33] NMFS00988.

Case No. 3:24-cv-00180-SLG, *Oceana, Inc. v. Nat'l Marine Fisheries Serv., et al*.
Decision and Order
Page 8 of 37

temporary in nature.[34]  As for the groundfish fisheries, "the preliminary evaluation model could not quantitatively determine a level as to when fishing effects would be considered 'more than minimal and not temporary in nature,'" but NMFS nonetheless considered "a range of actions to minimize adverse effects of fishing."[35]  NMFS chose Alternative 5C in the EIS, which "prohibit[ed] all bottom contact fishing within six coral garden areas, providing a higher level of protection for those especially diverse and fragile habitats" in the Aleutian Islands and closed bottom trawling in ten areas in the Gulf of Alaska "slope to reduce the effects of fisheries with higher scores in the evaluation of the effects of fishing on EFH."[36]  Alternative 5C was intended "to reduce the effects of fishing on corals, sponges, and hard bottom habitats."[37]

NMFS again considered fishing effects in a 2010 EFH review using the LEI fishery effects analysis from the 2005 EIS.[38]  After analyzing the most recent data on fishing intensity and habitat distribution and "new information in the literature regarding impacts and recovery," NMFS determined that management changes were not necessary.[39]

---

[34] NMFS00988-89.

[35] NMFS00989; COUN19284.

[36] NMFS01002 (citing Appendix B).

[37] NMFS00990, NMFS00999.

[38] COUN19284; COUN19219.

[39] COUN19284.

For the 2015 EFH review—completed in 2017—"the Council requested several updates to the LEI."[40]  In response, the Council's Scientific and Statistical Committee ("SSC") worked with scientists at Alaska Pacific University to develop the "Fishing Effects" ("FE") model.[41]  The FE model uses a three-tiered approach to evaluate whether adverse fishing effects on EFH are more than minimal and not temporary.[42]  Stock assessment authors first determine whether the population is above or below MSST.[43]  If the stock is below MSST, then the stock author may recommend mitigation measures if reductions of EFH are plausibly connected to the stock's population level.[44]

If the stock is above MSST, then the stock author evaluates whether fishing has disturbed 10% or more of the stock's core EFH area ("CEA"), which is defined as the 50% population quantile.[45]  "The 10 percent threshold was selected based on the assumption that impacts to less than 10 percent of the CEA means than more than 90 percent of the CEA (top 50 percent of suitable habitat or summer

---

[40] COUN19219.

[41] COUN19219; NMFS08549.

[42] COUN19219.

[43] COUN19293 ("Because EFH is defined for populations managed by Council Fishery Management Plans (FMPs), the first consideration of the Fishing Effects analysis is at the population level.").

[44] COUN19293.

[45] COUN19296.  The use of the 50% quantile is "to avoid the likelihood that important areas are excluded (if using the smaller area, 25% quantile) and to avoid statistically minimizing the amount of habitat reduction by using the larger, 95% quantile."  COUN19296.

Case No. 3:24-cv-00180-SLG, *Oceana, Inc. v. Nat'l Marine Fisheries Serv., et al*.
Decision and Order
Page 10 of 37

abundance) was undisturbed, and therefore represented minimal disturbance."[46] "[T]he 10% threshold does not preclude stock assessment authors from completing the evaluation protocol for levels of disturbance less than 10%, if other data suggest that impacts may be affecting the population," but generally, if less than 10% of CEA is disturbed, no further action is required.[47]   However, if stock authors have concerns about reliance on the FE model due to data limitations, they have the option of using an FE model that evaluates 75% of CEA or of doing a qualitative assessment.[48]

If there has been a disturbance of 10% or more of a stock's CEA by fishing, then the stock author evaluates whether there are significant correlations between "growth-to-maturity, spawning success, breeding success, and feeding success" of a stock and "trends in the proportion of the CEA impacted by fishing."[49]   If the correlations are found to be significant, the stock author elevates the potential impact to the Plan Team and SSC for review or provides an explanation as to why further review of the issue is not necessary.[50]   If the Plan Team and the SSC determine that the impact is more than minimal and not temporary, then the Plan

---

[46] COUN20013.

[47] COUN19293; COUN19296.

[48] NMFS05669.

[49] COUN19296-97.

[50] COUN19297.

Team and SSC recommend mitigation measures to the Council for consideration as an FMP amendment.[51]

For the 2015 EFH review, the Council used the revised FE model to assess the fishing effects on EFH.[52] "None of the stock assessment authors concluded that habitat reduction within the CEA for their species was affecting their stocks in ways that were more than minimal or not temporary" and "[n]one of the authors recommended any change in management with regards to fishing within EFH."[53] Further, the EFH 5-year Review Summary Report noted that the FE model "addressed" "[m]ost of the comments from the 2004" independent review, "with the exception of issues related to long-lived species such as corals, and localized impacts."[54] Nonetheless, to address concerns that the FE model inadequately captured the recovery needed for long-lived species like corals, NMFS reviewed studies showing that "corals have the highest density and depths of 400-700m, on bedrock or cobbles, with moderate to very high roughness, and slopes greater than 10 percent."[55] Based on these studies, NMFS added a "deep and rocky substrate habitat category" and, "[t]o be precautionary, the new habitat category was defined

_____

[51] COUN19297.

[52] COUN20011-32.

[53] COUN20031.

[54] NMFS08549.

[55] NMFS08559.

as cobble or boulder habitats deeper than 300m."[56]  And, in an effort to "account

for long-lived species expected to be found in these habitats, a new 'Long-Lived

Species' habitat feature was added with a . . . recovery time of 10-50 years. The

50-year upper limit of recovery time was calculated with the expectation that 5%

of the long-lived species would require 150 years to recover."[57]

NMFS began its next EFH review in 2019.[58]  Over the next two years, NMFS

provided progress reports to the Council and various working groups while the

SSC provided input on the EFH review.[59]  In January 2022, NMFS provided the

Council with an update on the models used for mapping EFH and determining

fishing effects on EFH.[60]   In April and July 2022, the stock assessment authors

reviewed the FE model results and completed their FE evaluations for 103

species.[61]   Stock authors also completed a survey in which they could raise

concerns about the EFH maps and the FE model.[62]  The model results and the

---

[56] COUN19291.

[57] COUN19291-92 ("Inclusion of this new category resulted in an average increase of 0.03% more habitat in a disturbed state compared to the original model predictions.").

[58] COUN02576.

[59] COUN02576-77; COUN07772-73.

[60] COUN02576; COUN14252-321.

[61] COUN02577; NMFS05541; *see also* NMFS05542 (discussing data limitations that prevented stock authors from determining the fishing effects on EFH for nine species).

[62] NMFS05572.

Case No. 3:24-cv-00180-SLG, *Oceana, Inc. v. Nat'l Marine Fisheries Serv., et al*.
Decision and Order
Page 13 of 37
Case 3:24-cv-00180-SLG     Document 51     Filed 09/30/25     Page 13 of 37

stock authors survey responses were presented to the SSC in October 2022.[63] The SSC found that the EFH methodology was appropriate for the 2023 5-year Review and also recommended areas for improvement.[64] The SSC recommended that future research should assess the fishing effects to the CEA for different life history stages of FMP species and, regarding recovery times used within the FE model, noted that the recovery times in the FE model will be updated continuously with the best available science.[65]

Throughout the EFH review process, Oceana provided input to the Council and NMFS. Beginning in September 2021, "Oceana presented the Council with evidence that fragile habitat features exist in shallow waters less than 300 meters and that impacts to these features were not being disclosed."[66] In 2022, Oceana also raised concerns that the impacts to EFH for juvenile and subadult stocks were being "ignored."[67]

In January 2023, NMFS and Council staff completed the 2022 Evaluation of Fishing Effects on Essential Fish Habitat.[68] The stock authors identified only two

---

[63] NMFS05573.

[64] NMFS05573.

[65] NMFS05573.

[66] Docket 31 at 26 (first citing EML00977-79; then citing EML03913 (raising same issues in January 2022); and then citing SUPP00207 (raising same issues in September 2022)).

[67] SUPP00206.

[68] NMFS05540-744.

species with stocks below MSST: EBS blue king crab and EBS snow crab.[69]  The

authors identified sixteen species with 10% or more of CEA disturbed by fishing

activities, and the stock authors analyzed whether there was a correlation between

various metrics and CEA disturbance.[70]   None of the stock authors "concluded

that fishing effects on their species were more than minimal and not temporary,"

and no stock authors "recommended to elevate their species to the Plan Teams

and the SSC for possible mitigation to reduce fishing effects to EFH."[71]

As part of the 2023 EFH 5-year Review, NMFS also produced a report on

impacts to EFH by non-fishing activities in Alaska.[72]   In the report, NMFS

recommended conservation measures for roads and transportation corridors and

dredging activities.[73]

---

[69] NMFS05674.  "EBS" is eastern Bering Sea.  NMFS05726.  The stock authors for EBS blue king crab and EBS snow crab conducted the required FE analysis and concluded that mitigation measures were not necessary.  NMFS05729 ("Given the minimal amount of fishing-related habitat disturbance estimated in the core EFH area, I see no need for further mitigation measures for BKC beyond those currently-implemented, such as the various Habitat Conservation Zones."); NMFS05735 ("I do not think I have sufficient information to elevate this species to the Plan Team and SSC for possible mitigation. Analyses focused on areas thought to be important in reproductive dynamics (e.g. the middle domain around the Pribilofs) could be useful in making the decision on whether or not to elevate this species for mitigation.").

[70] NMFS05587.

[71] NMFS05542.

[72] NMFS07986--8071.

[73] NMFS08041-44, NMFS08070-71.

NMFS prepared a 2023 EFH Review Summary Report and presented the EFH review to the Council in February 2023.[74]  In the report, NMFS recommended that several of the EFH Components be revised in certain FMPs.[75]  For example, regarding Component 1, NMFS recommended updating EFH descriptions and identifications for individual species and to add or replace the EFH maps in each FMP.[76]  Regarding Component 6, NMFS noted that "[f]or the 2023 EFH 5-Year Review, NMFS revised the EFH conservation recommendations for non-fishing activities in the non-fishing report under EFH component 4."[77]  NMFS also recounted the mitigation measures, implemented in 2005, that minimize impacts on EFH.[78]  "[B]ased on the analysis with the FE model, the Council concurred with the Plan Team and SSC consensus that the effects of fishing on EFH do not currently meet the threshold of more than minimal and not temporary, and that mitigation action is not needed at this time."[79]

In accordance with NMFS's recommendations, in February 2023, the Council voted to recommend FMP amendments to incorporate the new information

---

[74] COUN02566-685; COUN02577.

[75] COUN02584-85.

[76] COUN02584-85.

[77] COUN02653.

[78] COUN02653.

[79] NMFS00687.

from the 2023 EFH review.[80]   The Council also approved a purpose and need statement and two alternatives for the action.[81]   Additionally, during the Council's February 2023 meeting, the Advisory Panel recommended "that the Council develop a request for proposals as outlined in component 6 and 8 to conserve and enhance fisheries habitat."[82]   "While the Council elected not to initiate an additional EFH process at that time, the Council stated a willingness to consider habitat proposals under staff tasking at a future meeting."[83]   In response, Oceana

---

[80] NMFS00652. The five FMPs are for the Groundfish Fishery of the Bering Sea and Aleutian Islands Area; Groundfish of the Gulf of Alaska; Bering Sea/Aleutian Islands King and Tanner Crabs; Fish Resources of the Arctic Management Area; and the Salmon Fisheries in the Exclusive Economic Zone off Alaska.  NMFS00644.

[81] COUN03500 ("The purpose of the proposed action is to comply with the Final Rule implementing the EFH provisions of the Magnuson-Stevens Act (MSA) (50 CFR Part 600, Subpart J). The EFH Final Rule states that a review of the EFH components of the Council's FMPs should be completed at least every five years and the EFH provisions should be revised or amended, as warranted, based on the best available science contributing new information. Based on the 2023 EFH 5-year Review, substantial new information is available to revise many of the EFH components of five FMPs (BSAI Groundfish, GOA Groundfish, BSAI King and Tanner Crab, Arctic, and Salmon) to incorporate this new information.").

[82] COUN03496.

[83] COUN05158; COUN21685 (link to video recording of February 2023 Council meeting at 2:13:27-2:40:10 wherein the Council discusses whether the Council should issue a formal request for proposals regarding conservation and enhancement of habitat and the current efforts already underway—i.e., a climate change task force and an examination of pelagic trawls—that could lead to management actions to conserve and enhance habitat); *see also* COUN03496-98 (reviewing opposition and support for the Advisory Panel's motion for requests for proposals).

After oral argument, Federal Defendants filed a Notice of Record Citations, maintaining that the portions of the video recording of the February 2023 Council meeting showed that the Council and NMFS "discussed the potential for further conservation and enhancement measures independent of the EFH review process for nearly thirty minutes."  Docket 47 at 2 (citing COUN21685 (link to video recording)).   Oceana objects to Federal Defendants' Notice, contending that Federal Defendants had never before argued that the Council and NMFS had in fact considered additional conservation and enhancement measures, and so Federal Defendants should not be able to argue as such in the Notice.  Docket 49 at 2-3.  Alternatively, Oceana submits that the Council meeting referenced does not show that Federal Defendants considered additional

---

submitted a "staff tasking [and] habitat conservation proposal" to the Council in June 2023.[84]  Oceana proposed to "freeze the footprint of bottom trawling" in "90% of the Gulf of Alaska . . . while displacing a maximum of 5% of recent bottom trawl fishing area."   Oceana also recommended "that all pelagic and semi-pelagic groundfish trawls in the Gulf of Alaska be required to use net sensors and fish entirely above the seafloor with no bottom contact when fishing in any existing or proposed conservation area closed to groundfish bottom trawl gear."[85]   Oceana presented its proposal to the Council at its June 2023 meeting.[86]   "The Council chose not to task staff with developing a discussion paper on this proposal."[87]

In November 2023, NMFS completed an Environmental Assessment ("EA") analyzing the Council's two proposed alternatives.[88]  Alternative 1 was a no action alternative.  Alternative 2 would amend the five "FMPs to incorporate the updated EFH information based on the new and best available science information

---

conservation and enhancement measures.  Docket 49 at 3-4.  The Court agrees with Oceana that the citations provided by Federal Defendants show that the Council and NMFS were open to considering conservation and enhancements proposals in the future, but that they did not consider specific conservation and management measures during the February 2023 meeting.  Oceana submitted its proposal in response to the discussion about future measures.  The recording is therefore relevant and properly considered by the Court.

[84] COUN05158.

[85] COUN05158.

[86] *See* NPFMC Council/AP June 2023 - 265th, Agenda Item E Staff Tasking/Committees, https://meetings.npfmc.org/Meeting/Details/2993 (click link to view "Comments" and "AP list Sign-ups") (identifying Oceana testified and presented their Gulf of Alaska proposal).

[87] Docket 35 at 26.

[88] COUN05224-74.

identified in the 2023 EFH 5-year Review."[89]  Alternative 2 would also revise the fishing effects analysis in certain FMPs to reflect updates to the FE model, analysis, and evaluation, and would revise EFH appendices in certain FMPs "where conservation recommendations for nonfishing activities are described."[90] Included as appendices to the EA were proposed amendments to each FMP; for example, Appendix A provided redline changes to the FMP for the Groundfish of the Bering Sea and Aleutian Islands Area.[91]  As a result of the 2023 EFH Review, NMFS was able to provide EFH descriptions for various species at more life stages than was previously possible.[92]

In December 2023, the Council voted to recommend that NMFS "[a]mend the Council's FMPs to incorporate the updated EFH information based on the new and best available science information identified in the 2023 EFH 5-year review."[93] None of the recommended changes required regulatory action, as they were updates to descriptions and maps in existing EFH provisions of the FMPs.[94]

---

[89] COUN03500.

[90] COUN03500.

[91] NMFS00022-254.

[92] *See e.g.*, NMFS00026 (proposing EFH descriptions for Alaska plaice early juveniles and subadults where no description was possible previously due to insufficient information).

[93] COUN05304.

[94] COUN05224.

Case No. 3:24-cv-00180-SLG, *Oceana, Inc. v. Nat'l Marine Fisheries Serv., et al*.
Decision and Order
Page 19 of 37

On April 4, 2024, NMFS approved the EFH Omnibus FMP Amendments as described in the EA as Alternative 2.[95] On April 23, 2024, NMFS published a notice of availability for the proposed EFH amendments to the five FMPs in the Federal Register.[96] NMFS finalized the EA in July 2024.[97] Upon review of the EA, the NMFS's Regional Administrator issued a Finding of No Significant Impact ("FONSI").[98] He concluded that "the impacts of the proposed action are determined to be not significant" because "the direct impacts of the proposed action" were "limited to updating EFH to reflect new habitat and life history information to improve fisheries management with no accompanying changes to Federal regulations or management of the fisheries."[99] The amendments "did not establish any [new] measures to minimize adverse fishing effects or conservation or enhancement measures focusing on fishing impacts."[100] On July 19, 2024, NMFS published a Notice of Agency Decision in the Federal Register announcing its approval of the EFH amendments to the five FMPs.[101]

---

[95] NMFS00007-8.

[96] Fisheries of the Exclusive Economic Zone Off Alaska; Essential Fish Habitat Amendments, 89 Fed. Reg. 30318 (April 23, 2024); FR00005.

[97] NMFS00644-705.

[98] NMFS00011-16.

[99] NMFS00012.

[100] Docket 31 at 29 (citing FR00001-02).

[101] Fisheries of the Exclusive Economic Zone off Alaska; Essential Fish Habitat Amendments, 89 Fed. Reg. 58632 (July 19, 2024); FR00001.

Case No. 3:24-cv-00180-SLG, *Oceana, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 20 of 37
Case 3:24-cv-00180-SLG    Document 51    Filed 09/30/25    Page 20 of 37

In August 2024, Oceana filed this suit challenging several aspects of NMFS's 2023 EFH 5-year Review and the associated FMP amendments.[102] In December 2024, the Court granted a motion to intervene filed by At-Sea Processors Association, Alaska Groundfish Data Bank, and Groundfish Forum, Inc. (collectively, "Intervenor-Defendants").[103] Oceana filed its Opening Brief at Docket 31. Federal Defendants and Intervenor-Defendants responded in opposition at Docket 35 and Docket 34, respectively. Oceana replied at Docket 38. Oral argument was held on September 12, 2025.[104]

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[105]

## LEGAL STANDARD

"[R]eview of NMFS's compliance with the MSA and NEPA is governed by the Administrative Procedure Act ('APA'), 5 U.S.C. §§ 701-706, under which a

---

[102] Docket 1 (Compl.); Docket 16 (Am. Compl.).

[103] Docket 26.

[104] Docket 46.

[105] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

court may set aside an agency action if it is 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.'"[106]

> The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.[107]

The APA requires courts to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority. . . . [C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."[108]

## DISCUSSION

### I. Standing

As a threshold issue, Federal Defendants dispute whether Oceana has standing to bring its APA and NEPA claims.[109] Under Article III of the Constitution, "[t]he jurisdiction of the federal courts is limited to 'cases' and 'controversies.'"[110] Federal courts enforce this jurisdictional limitation through the doctrine of "Article

---

[106] *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1091 (9th Cir. 2012) (quoting 5 U.S.C. § 706(2)(A)); 16 U.S.C. § 1855(f)(1) (APA governs NMFS's compliance with the MSA).

[107] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

[108] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024).

[109] Docket 35 at 29-32.

[110] *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1138 (9th Cir. 2013) (quoting U.S. Const. art. III, § 2).

III standing."[111]   Oceana bears the burden of establishing its standing to bring suit.[112]  Oceana filed its lawsuit on behalf of its members.[113]  An organization can assert the interests of its members.[114]  Accordingly, Oceana must demonstrate that at least one member has standing to sue.

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[115]

Regarding injury-in-fact in environmental cases, "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff."[116]  "While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."[117]   As to the other two

---

[111] *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340-42 (2006).

[112] *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

[113]  Docket 31 at 30.

[114] *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

[115] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61).

[116] *Id.* at 181.

[117] *Summers*, 555 U.S. at 494.  *See also Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000) ("[A]n individual can establish 'injury in fact' by showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded.").

requirements, "the 'fairly traceable' and 'redressability' components for standing overlap and are 'two facets of a single causation requirement.'"[118]  "The two are distinct insofar as causality examines the connection between the alleged misconduct and injury, whereas redressability analyzes the connection between the alleged injury and requested judicial relief."[119]  "The interest that individuals have in observing a species or its habitat, 'whether those individuals are motivated by esthetic enjoyment, an interest in professional research, or an economic interest in preservation of the species' is sufficient to confer standing."[120]

Oceana maintains that its "members and supporters live near and rely on areas of the North Pacific that are designated as EFH under the fisheries management plans at issue in this litigation. They boat, fish, scuba dive, conduct research, and enjoy observing coral gardens and watching marine mammals and seabirds in areas of the North Pacific . . . ."[121]  Oceana contends that NMFS's

---

[118] *Bellon*, 732 F.3d at 1146 (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)).

[119] *Id.*

[120] *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) (quoting *Lujan*, 504 U.S. at 582).

[121] Docket 31 at 30-31 (first citing Docket 31-1 (Karnik Decl.) at ¶¶ 18-26, 29 (describing visits to the Gulf of Alaska to observe marine mammals, birds, bears, corals, and other marine organisms, and efforts to fish for salmon, halibut, and crab near Juneau); then citing Docket 31-2 (Boily Dec.) at ¶¶ 1, 3-10 (describing "a lifetime of commercial and subsistence fishing, sportfishing, working, [and] recreating" in the Gulf of Alaska, Being Sea, Aleutian Islands, and North Pacific Ocean); and then citing Docket 31-3 (Mitchell Decl.) at ¶¶ 1, 4-5, 7 (describing professional and personal experience traveling throughout Southeast Alaska, the Gulf of Alaska, the Bering Sea, and the Aleutian Islands)).

"failure to adequately analyze the effects of fishing on these areas or to consider any measures to conserve and enhance these habitats harms Oceana's members and supporters."[122]  Further, in Oceana's view, "[c]ontinued trawling in EFH harms [its members'] interests in viewing healthy coral gardens, marine mammals and other ocean life, and in harvesting fish and other species to feed their families."[123]

Federal Defendants respond that while "Oceana identifies its members' aesthetic, environmental, and recreational interests in Alaska's waters [it] offers only a conclusory theory for how these interests could be harmed by the non-regulatory action at issue in this case."[124]  Further, Federal Defendants contend that any injuries from continued trawling do not support a finding of standing here because "continued trawling is not the challenged action."[125]  Federal Defendants further contend that Oceana's proffered injuries to its members' interests are "not traceable to the Service's approval of the EFH amendments" and that Oceana has not identified how the relief it requests in this case will redress its members' purported injuries.[126]

---

[122] Docket 31 at 31.

[123] Docket 31 at 31.

[124] Docket 35 at 30.

[125] Docket 35 at 30.

[126] Docket 35 at 31-32.

The Court finds that Oceana has standing. A review of the declarations of Oceana's members shows that each member has an interest in observing species and habitat in the waters surrounding Alaska at issue in this case and those interests could be injured by NMFS's purported violations of the MSA and NEPA when enacting the EFH amendments. Further, Oceana asserts that NMFS improperly concluded that no additional measures were necessary to remedy adverse effects of fishing on EFH and failed to include conservation and enhancement measures in the omnibus amendments to the five FMPs. Oceana has shown that its members' alleged injuries are traceable to Federal Defendants and would be redressed by an order directing NMFS to reconsider its decision to include additional measures that would restrict fishing activities or to identify further conservation and enhancement measures. Therefore, the Court finds that Oceana has standing.

## II. MSA

Oceana maintains that Federal Defendants violated the MSA because NMFS's use of both "(1) MSST and (2) a ten percent impact disturbance threshold to a subset of the designated EFH" is inconsistent with the MSA's requirement that FMPs "minimize to the extent practicable adverse effects on such habitat caused by fishing."[127]

---

[127] Docket 31 at 32; 16 U.S.C. § 1853(a)(7).

Regarding MSST, Oceana claims that "[u]sing MSST as a proxy for habitat loss means, by definition, the need to take action to minimize effects under this test is not triggered until the loss is significant enough to cause a stock to fail."[128] But that is not the case. NMFS's multi-tiered approach considers MSST at the first of several analytical steps. If a stock population is above MSST, stock authors must still assess whether 10% or more of the stock's CEA has been disturbed by fishing activities. And if stock authors have concerns with using a CEA of the 50% quantile, they can ask NMFS for a model using a CEA of 75% or they can perform a qualitative analysis to assess whether fishing has an adverse effect on a stock's EFH.[129]

Oceana also contends that MSST is inappropriate because "it does not assess impacts on habitat" and that, by using MSST, NMFS has "instituted substantial, unlawful barriers to finding adverse effects in a way that wholly avoids its statutory obligations to minimize impacts under the MSA."[130] NMFS begins its assessment with MSST "[b]ecause EFH is defined for populations managed by Council Fishery Management Plans (FMPs), [and so] the first consideration of the Fishing Effects analysis is at the population level."[131] And, as noted above, MSST

---

[128] Docket 31 at 38.

[129] *See supra* pp. 10-11.

[130] Docket 31 at 36-37.

[131] COUN19293.

Case 3:24-cv-00180-SLG     Document 51     Filed 09/30/25     Page 27 of 37

is not the sole consideration in the fishing effects analysis rather, it is a starting point. And for all stocks, even those with populations above MSST, stock authors assess how much of the stock's CEA has been disturbed by fishing activities. Therefore, NMFS considers a specific habitat metric for all stocks, regardless of whether their populations are above MSST.

Regarding CEA, Oceana claims that "application of a ten percent impact threshold to" CEA "is inappropriate and contrary to law."[132] NMFS explained that it chose a 50% quantile for CEA "to avoid the likelihood that important areas are excluded (if using the smaller area, 25% quantile) and to avoid statistically minimizing the amount of habitat reduction by using the larger, 95% quantile."[133] And NMFS selected the 10% threshold for disturbed CEA "based on the assumption that impacts to less than 10 percent of the CEA means [that] more than 90 percent of the CEA (top 50 percent of suitable habitat or summer abundance) was undisturbed, and therefore represented minimal disturbance."[134]

The MSA requires NMFS to "minimize to the extent practicable adverse effects on such habitat caused by fishing," and the EFH Guidelines similarly require NMFS to minimize "adverse effects from fishing, to the extent practicable, if there is evidence that a fishing activity adversely affects EFH in a manner that is more

_____

[132] Docket 31 at 39.

[133] COUN19296.

[134] COUN20013.

than minimal and not temporary in nature[.]"[135]  And the APA's "standard is 'highly deferential,' and that deference 'is at its highest where a court is reviewing an agency action that required a high level of technical expertise.'"[136]  The Court finds that NMFS's implementation of its obligation to minimize adverse fishing effects—by using a fishing effects model that examines MSST and implements a 10% threshold for CEA disturbance in its fishing effects analysis—is warranted a high degree of deference.  Further, Oceana does not offer an alternative method to determine when fishing impacts are more than minimal and not temporary; nor does Oceana challenge the regulation itself as being inconsistent with the MSA.  Therefore, the Court finds that NMFS's consideration of MSST and its focus on EFH where stocks are most concentrated is not arbitrary, capricious, or in violation of the MSA or APA.

Oceana also maintains that NMFS violated the MSA by "ignor[ing] evidence that important structure forming benthic habitat features reside at depths less than 300 meters and take more than 50 years to recover" and by "disregard[ing] evidence demonstrating fish of all life stages rely on structure-forming benthic habitat features" and "fail[ing] to assess impacts to all EFH that supports all life

---

[135] 16 U.S.C. § 1853(a)(7); 50 C.F.R. § 600.815(a)(2)(ii).

[136] *Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1056 (9th Cir. 2024) (first quoting *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014); and then quoting *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1043 (9th Cir. 2015)).

Case No. 3:24-cv-00180-SLG, *Oceana, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 29 of 37
Case 3:24-cv-00180-SLG    Document 51    Filed 09/30/25    Page 29 of 37

stages of managed species, instead winnowing its analysis down to only the core area that supports adult species."[137]

The Court agrees with Federal Defendants that "neither the MSA nor its regulations expressly require the Service to consider long-lived habitat features or to do so in a particular manner."[138] Further, the Court finds that NMFS's consideration of a "deep and rocky substrate habitat category," which NMFS precautionarily defined as "cobble or boulder habitats deeper than 300m," was reasonable because the scientific studies that NMFS reviewed indicated that "corals have the highest density and depths of 400-700m, on bedrock or cobbles, with moderate to very high roughness, and slopes greater than 10 percent."[139] NMFS's exercise of its technical expertise in creating habitat areas for inclusion in the FE model is entitled to substantial deference.

As for the consideration of the CEA for primarily adult stocks, the Court also finds that NMFS's decision to evaluate CEA for adult stocks is also entitled to substantial deference. As shown by the amendment to the FMP for the Groundfish of the Bering Sea and Aleutian Islands Area, data limitations have historically existed for juvenile and subadult stocks.[140] Therefore, NMFS's use of adult stocks

---

[137] Docket 31 at 33, 42-45.

[138] Docket 35 at 42.

[139] COUN19291; NMFS08559.

[140] NMFS00022; NMFS00026 (proposing EFH descriptions for Alaska plaice early juveniles and subadults where no description was previously due to insufficient information).

Case No. 3:24-cv-00180-SLG, *Oceana, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 30 of 37

to determine CEA is reasonable. Further, NMFS considers other life stages throughout the review process and is actively attempting to address the data limitations for other life stages.[141]

Oceana further contends that NMFS violated the MSA because, "separate and apart from the obligation to minimize adverse fishing effects, the Service must assess whether it could take actions to meet its broader obligation to conserve and enhance EFH . . . which the Service did not lawfully do."[142] Oceana acknowledges that NMFS adopted conservation and enhancement measures for activities "related to non-fishing effects on EFH, such as avoiding dredging activities during vulnerable periods and avoiding burying aquatic vegetation during road construction."[143] Nevertheless, Oceana maintains that NMFS violated the MSA because it "did not adopt any conservation and enhancement measures" regarding "fishing effects" "in this five-year EFH review" and NMFS's past actions do not satisfy NMFS's MSA obligations.[144] Further, in Oceana's view, NMFS violated the MSA by failing to consider Oceana's conservation and enhancement proposal to

_____

[141] *See* Docket 35 at 41 (citing COUN02701 (January 2023 report noting that NMFS created distinct EFH maps based on species' life stages for the first time in the 2023 EFH 5-year review)); NMFS05573 (SSC recommending future research to assess the fishing effects to CEA for different life stages).

[142] Docket 38 at 10.

[143] Docket 31 at 41 (emphasis omitted).

[144] Docket 31 at 41; Docket 38 at 10 n.1 (emphasis omitted).

Case No. 3:24-cv-00180-SLG, *Oceana, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 31 of 37

freeze trawling in a majority of the Gulf of Alaska and to impose certain gear requirements.[145]

Under the MSA, an FMP must "describe and identify essential fish habitat for the fishery based on the guidelines established by the Secretary[,] . . . minimize to the extent practicable adverse effects on such habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat."[146]  Under Component 2, "Councils must act to prevent, mitigate, or minimize any adverse effects from fishing, to the extent practicable, if there is evidence that a fishing activity adversely affects EFH in a manner that is more than minimal and not temporary in nature."[147]  Component 6 requires that an FMP "identify actions to encourage the conservation and enhancement of EFH, including recommended options to avoid, minimize, or compensate for the adverse effects identified [from non-MSA activities, non-fishing activities, and cumulative impacts], especially in habitat areas of particular concern."[148]

The Court finds that NMFS did not violate these obligations in its 2023 EFH 5-year Review or by approving the omnibus amendments at issue here.  NMFS conducted the 2023 EFH 5-year review in accordance with the schedule set by the

_____

[145] Docket 31 at 42.

[146] 16 U.S.C. § 1853(a)(7).

[147] 50 C.F.R. § 600.815(a)(2)(ii).

[148] *Id.* § 600.815(a)(6).

Secretary "for the review and updating of [EFH] identifications based on new scientific evidence or other relevant information."[149]   As such, the omnibus amendments revise relevant portions of each FMP to reflect updated EFH identifications and other Components.  And NMFS did in fact identify conservation and enhancement measures regarding non-fishing activities and revised the FMPs accordingly.[150]   Further, as Federal Defendants point out, other portions of the FMPs contain "EFH conservation and enhancement measures across hundreds of thousands of square nautical miles of seafloor off Alaska (including prohibiting seafloor contact, fishing gear restrictions, time/area closures, and HAPC designations)."[151]  Whether conservation and enhancement measures are needed or to what extent is a determination requiring NMFS's technical expertise and NMFS's decision to forgo additional conservation and enhancement measures in the omnibus amendments is entitled to deference.  And because the MSA does not dictate that NMFS consider every conservation and enhancement proposal put before it, NMFS's failure to consider Oceana's proposal did not violate the MSA.

---

[149] 16 U.S.C. § 1855(b)(1)(A).

[150] COUN02653; NMFS00649.

[151] Docket 35 at 39 (citing NMFS00793-98 (describing numerous actions taken by NMFS in various FMPs to limit or close areas from fishing activities like trawling)); *see also American Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 14 (D.D.C. 2000) (finding that the federal defendants could look at prior management measures "in analyzing whether *additional* ones are necessary" (emphasis in original)).

Case No. 3:24-cv-00180-SLG, *Oceana, Inc. v. Nat'l Marine Fisheries Serv., et al*.
Decision and Order
Page 33 of 37

In sum, the Court finds that Federal Defendants did not violate the MSA or the APA in performing the 2023 EFH 5-year Review or in approving the omnibus FMP amendments because the action was not arbitrary, capricious, or in violation of law.

## III.    NEPA

As the Supreme Court recently emphasized in *Seven County Infrastructure Coalition*, "the central principle of judicial review in NEPA cases is deference."[152] "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness."[153]

NEPA established the Council on Environmental Quality and created procedures requiring "that federal agencies take a 'hard look' at the environmental consequences of their actions."[154]   Here, to meet its NEPA obligations, NMFS completed an EA.  An EA is required for a "proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown."[155]  An EA "shall be a concise public document prepared by a Federal agency to set forth the basis of

---

[152] *Seven Cnty. Infrastructure Coal. v. Eagle County.*, 145 S. Ct. 1497, 1511 (2025).

[153] *Id.* at 1513.

[154] *California v. Norton*, 311 F.3d 1162, 1175 (9th Cir. 2002) (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000)); 42 U.S.C. §§ 4321-4370m-12.

[155] 42 U.S.C. § 4336(b)(2).  In contrast, if the proposed agency action "has a reasonably foreseeable significant effect on the quality of the human environment," the action agency must prepare an Environmental Impact Statement.  *Id.* § 4336(b)(1).  Oceana does not challenge NMFS's decision to prepare an EA instead of an EIS.

Case No. 3:24-cv-00180-SLG, *Oceana, Inc. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 34 of 37
Case 3:24-cv-00180-SLG    Document 51    Filed 09/30/25    Page 34 of 37

such agency's finding of no significant impact or determination that an environmental impact statement is necessary."[156]

In an EA, "NEPA requires federal agencies to 'study, develop, and describe appropriate [project] alternatives.'"[157] "The agency must at least consider a 'preferred' alternative and a 'no action' alternative, and 'give full and meaningful consideration to all reasonable alternatives.'"[158] The Ninth Circuit has "repeatedly held that an agency satisfies NEPA when it considers only two alternatives—action and no action."[159] A court "determine[s] whether the agency considered a reasonable range of alternatives based on its purpose and need."[160]

Oceana maintains that NMFS violated NEPA because the EA did not consider a reasonable range of alternatives or address Oceana's proposal to freeze trawling in the majority of the Gulf of Alaska.[161] Federal Defendants respond that NMFS's consideration of a no action and a preferred alternative in the EA was reasonable considering that the purpose and need of the agency action was to

---

[156] *Id.* § 4336(b)(2).

[157] *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023) (alteration in original) (quoting *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013)).

[158] *Id.* (quoting *W. Watersheds Project*, 719 F.3d at 1050).

[159] *Id.*; *see also Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1022 (9th Cir. 2012) ("[W]e are aware of no Ninth Circuit case where an EA was found arbitrary and capricious when it considered both a no-action and preferred action alternative.").

[160] *City of Los Angeles v. Fed. Aviation Admin.*, 63 F.4th 835, 843 (9th Cir. 2023) (citation omitted).

[161] Docket 31 at 45.

implement the findings of the 2023 EFH 5-year Review and not to consider or propose "any and all possible changes to its FMPs."[162]   And, in Federal Defendants' view, Oceana's proposal to freeze the trawling footprint in the Gulf of Alaska was not a reasonable alternative "because the Service did not recommend additional conversation measures in its EFH review, and thus, Oceana's proposal does not meet the action's purpose and need."[163]

The Court finds that NMFS considered sufficient alternatives to satisfy NEPA.  The Council defined the purpose and need for the action as:

> to comply with the Final Rule implementing the EFH provisions of the Magnuson-Stevens Act (MSA) (50 CFR Part 600, Subpart J). The EFH Final Rule states that a review of the EFH components of the Council's FMPs should be completed at least every five years and the EFH provisions should be revised or amended, as warranted, based on the best available science contributing new information. Based on the 2023 EFH 5-year Review, substantial new information is available to revise many of the EFH components of five FMPs (BSAI Groundfish, GOA Groundfish, BSAI King and Tanner Crab, Arctic, and Salmon) to incorporate this new information.[164]

Considering this purpose and need, a no action alternative (no update to the FMPs) and a preferred alternative (update the FMPs with the findings from the EFH 2023 5-year Review) constituted a reasonable range.[165]   Further, the

---

[162] Docket 35 at 44-45; *see also* Docket 34 at 38-40 (Intervenor-Defendants arguing same).

[163] Docket 35 at 44; *see also* Docket 34 at 40-41 (Intervenor-Defendants arguing same).

[164] COUN03500.

[165] *See N. Idaho Cmty. Action Network v. U.S. Dep't of Trans.*, 545 F.3d 1147, 1153-54 (9th Cir. 2008) (holding that agency did not violate NEPA when it considered two alternatives—the project with the proposed changes and the project without the proposed changes—and the project as

alternatives were reasonable considering that NMFS determined that the action would have no significant impact on the environment, a determination that Oceana does not challenge. And as to Oceana's assertion that NMFS must revise all EFH Components during each 5-year EFH review, the Court agrees with Federal Defendants that the MSA requires that FMPs address each Component, not that NMFS must take action on all Components in each 5-year EFH review.[166] And Oceana's proposal to freeze trawling in the majority of the Gulf of Alaska went far beyond revising the EFH Components with "substantial new information" based on the 2023 EFH 5-year Review and instead would constitute a new management action to limit fishing activity and impose gear requirements for pelagic and semi-pelagic groundfish trawls. The Court therefore finds that NMFS did not violate NEPA.

## CONCLUSION

In light of the foregoing, Oceana's claims are DISMISSED with prejudice. The Clerk of Court is directed to enter a final judgment for Defendants accordingly.

DATED this 30th day of September, 2025, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

proposed would not result in significant environmental effects not previously evaluated).

[166] *See* Docket 35 at 46-47.

Case No. 3:24-cv-00180-SLG, *Oceana, Inc. v. Nat'l Marine Fisheries Serv., et al*.
Decision and Order
Page 37 of 37